**Larry D. TREW, Plaintiff,**

v.

**Donna E. SHALALA, Secretary of Health and Human Services, Defendant.**

No. 4:CV93–3425.

United States District Court, D. Nebraska.

Aug. 24, 1994.

Glen A. Murray, Grand Island, NE, for plaintiff.

Steve A. Russell, Asst. U.S. Atty., Omaha, NE, for defendant.

## MEMORANDUM AND ORDER

KOPF, District Judge.

When the Appeals Council in a social security case considers newly submitted evidence not considered by the administrative law judge (ALJ), the reviewing court is presented with "a peculiar task" because the court "must speculate to some extent on how the administrative law judge would have weighed the newly submitted reports if they had been available for the original hearing." *Riley v. Shalala,* 18 F.3d 619, 622 (8th Cir.1994). Such is the situation in this case.

Larry D. Trew (Trew) appeals from the determination by Donna E. Shalala, Secretary of Health and Human Services (the Secretary), denying him disability insurance benefits and supplemental security income. Trew brought this action in this court contending that the ALJ erred by not correctly assessing the credibility of Trew and his wife, particularly because the ALJ discounted Trew's subjective complaints of pain.

Considering this case as upon cross-motions for summary judgment, (Filing 6), I shall grant summary judgment in favor of Trew. I find that there is not substantial evidence on the record as a whole, particularly after considering the new evidence, to support the ALJ's credibility assessment. The credibility assessment was critical to the determination of whether Trew was able to work, and since the burden of proof was on the Secretary to establish that Trew could work, given the ALJ's "step-four" findings, the denial of benefits was erroneous. However, under these "peculiar" circumstances, remand, as opposed to an outright award of benefits, is the appropriate remedy.

## I. BACKGROUND

Trew was born November 1, 1938, and was 53 years old at the time of the initial hearing. He complained of the following impairments: a right rotator cuff tear, degenerative changes of the cervical spine, and liver sensitivity to certain materials resulting from exposure to chemical solvents. He did not have a high school education. Until 1990 he had worked all of his adult life doing mechanical labor.

## A. THE ALJ'S ULTIMATE FINDINGS

Trew filed an application for supplemental security income benefits under Title XVI of the Social Security Act in the fall of 1990. He filed an application for disability insurance benefits under Title II of the Social Security Act soon thereafter. Both applications were initially denied on December 10, 1991, and again on reconsideration on February 19, 1992.

Trew filed a request for hearing on April 14, 1992. The hearing was held before an ALJ on June 4, 1992, and a supplemental hearing was held on March 3, 1993.

On April 16, 1993, the ALJ issued a decision finding that Trew was not eligible for a period of disability insurance benefits or supplemental security income. By reference to the five-step sequential evaluation process, *Bowen v. City of New York*, 476 U.S. 467, 470–71, 106 S.Ct. 2022, 2025, 90 L.Ed.2d 462 (1986), I shall summarize the ALJ's finding.

The ALJ first determined that Trew had not engaged in substantial employment on and after November 9, 1990. (Tr. 26, Findings 1, 2.) This, of course, meant that the ALJ was required to proceed to the next step.

The ALJ then determined that Trew had severe impairments. (Tr. 26, Findings 3, 5, 6.) The ALJ specifically found that Trew suffered from a right rotator cuff tear, degenerative changes of the cervical spine, and liver sensitivity to certain materials. (Tr. 26, Finding 3.) This finding in turn required the ALJ to proceed to the third step.

The ALJ then found that Trew's impairments did not meet or equal the impairments set forth in the "Listing of Impairments." (Tr. 26, Finding 3.) Since Trew was not disabled within the meaning of the "Listing of Impairments", the ALJ was required to proceed to the fourth step.

At step four, the ALJ assessed Trew's residual functional capacity and concluded that Trew could not perform his past relevant work as a mechanic and auto body worker, crane operator, truck driver, and farmer. (Tr. 26, Finding 6.) This in turn required the ALJ to proceed to step five.

As the ALJ recognized, the step-four finding required the ALJ to shift the burden of proof to the Secretary "to show that there are other jobs existing in significant numbers in the national economy which [Trew] can perform consistent with his medically determinable impairments and symptoms, functional limitations, age, education[,] work experience, and skills, if any." (Tr. 20.) *See Bradshaw v. Heckler*, 810 F.2d 786, 789–90 (8th Cir.1987).

At step five, the ALJ requested that a vocational expert state an opinion about whether Trew could perform other work. (Tr. 144–47; 183–85.) The ALJ asked the vocational expert to assume, among other things, that Trew's pain, while chronic, would not interfere with his sleep and would permit him to drive his car. (Tr. 143–144) The expert concluded that while the jobs that Trew could perform were "very limited" Trew could perform the job of an insurance estimator. (Tr. 144; 185.)

Accordingly, since Trew could perform the job of an insurance estimator (and there were numerous jobs in the economy for insurance estimators) even with his severe disabilities, the ALJ found at step five that Trew was not disabled. (Tr. 27, Findings 10–13.)

## B. THE APPEALS COUNCIL DECISION

Trew asked the Appeals Council to review the ALJ's decision. As discussed more fully later, Trew submitted to the Appeals Council two medical opinions—one by a medical doctor and one by a chiropractor—which had not been provided to the ALJ. Both medical opinions essentially indicated that Trew was disabled and his right arm was useless.

The Appeals Council explicitly considered the new medical information. (Tr. 5–6.) The Council stated that it had "carefully considered ... the reports from Dr. Kevin Howard and Dr. Mark Jobman, but decided that ... the additional evidence [does not establish] a basis for changing the Administrative Law Judge's decision." (*Id.* at 5.)

## C. EVIDENCE OF ROTATOR CUFF INJURY BEFORE ALJ

In order to fully understand Trew's complaints of pain, and the ALJ's resolution of the pain issue, it is necessary to understand how Trew began to experience pain.

Trew testified that he began experiencing significant pain in his right shoulder while lifting overhead on May 2, 1990. Eventually, he could no longer perform mechanical labor and stopped working on November 9, 1990.

The following month, he underwent surgery for a right-rotator-cuff tear, followed by months of physical therapy and work-hardening.

Insofar as the rotator cuff injury was concerned, the ALJ found that Trew underwent open decompression and repair of his right rotator cuff following several months of conservative treatment. Physical therapy was initiated in January, 1991. After approximately four weeks of therapy, including ice, heat, electrical stimulation and exercises, Trew began a formal work-hardening program. After that, the ALJ found that Trew resumed a normal course of physical therapy which included ultrasound and use of a pulley. The ALJ found that Trew was still having pain and numbness in his right upper extremity on August 12, 1991, when one of his treating physicians, Dr. Wilkinson, concluded that Trew had reached maximum medical improvement.

## D. TESTIMONY OF COMPLAINTS OF PAIN BEFORE ALJ

Trew and his wife testified to pain, which if real, would arguably disable him from working as an estimator.

Trew testified that he had severe pain in his right shoulder which was not helped by the surgery. (Tr. 71.) The pain was "like if you got electrical shock," (*id.* at 72), and was caused by "just doing anything." (*Id.* at 73.) He experienced pain even when sitting quietly, (*id.*), and he testified that he was experiencing pain while giving testimony. (*Id.*) Indeed, without any activity, Trew testified that on a scale of one to ten, his pain was "5 or 6 probably." (*Id.* at 74.) When he moved his arm, the pain was "8 or 10." (*Id.*)

Trew testified that he took prescription Motrin and Advil. (*Id.* at 75.) Even with this prescription medication, however, the pain remained at a level of five or six. (*Id.* at 75.) Trew did not like to take medication because Advil made his ears ring. (*Id.* at 76.) Because the Motrin was by prescription and was to be taken only every four hours, he took Motrin only when his pain was a ten or so. (*Id.* at 77.) Trew testified that he used ice packs to help control the pain. (*Id.*)

Trew stated he could not reach across his body with his right arm and could not wash his shoulder. (*Id.* at 108.) Trew testified to muscle spasms where his muscles would "knot up," causing him "sharp pain." (*Id.* at 109.) These muscle spasms occurred more frequently when he was "up and around." (*Id.*)

Trew testified that he was frequently awakened from sleep and that "I haven't had a good night[']s sleep for the last, almost two years." (*Id.* at 110.) He also said he no longer had any social or recreational activities and had given up his hobbies of hunting and working on automobiles. (*Id.* at 111.)

Trew, who is right handed, testified at the hearing that "I just usually don't drive anymore than I usually have to." (Tr. 53.) Trew's wife drove him the 11 miles to the hearing. (*Id.*) Trew testified he could drive no more than an hour at a time, and in order to drive at all, "I usually just drive with my left hand." (Tr. 52.) In order to change lanes or turn the vehicle, however, Trew had to use his right arm. (Tr. 53.)

Trew's wife corroborated much of what Trew testified to. Trew and his wife had been married for over 30 years. (Tr. 115.) Specifically, Trew's wife confirmed that he suffered severe pain.

For example, she testified that on the morning of the hearing, Trew was sitting in a chair at the family home, and when he merely moved his hand and arm from the chair, he grimaced. (Tr. 119–20.) Trew frequently complained to his wife that "my shoulder is killing me." (Tr. 120.) Trew's wife testified that he frequently woke up three times a night as result of the pain. (Tr. 120–21.)

She also confirmed that he experienced adverse reactions to medications. At one time he was taking Vicodin and Percocet, but he stopped because "it caused him to have nightmares and also to feel like he's got little bugs crawling on him." (Tr. 122.) According to his wife, Trew does not like to take medication.

Although Trew testified that he mowed the grass from time to time using a *riding mower*, his wife testified that "the next day, he walks around holding his shoulder." (Tr.

123.) She told the ALJ that lawn mowing was "generally my job." (Tr. 124.)

## E. MEDICAL RECORD BEFORE THE ALJ REGARDING PAIN

The record before the ALJ established that Trew suffered a significant amount of pain as a result of the injury to his right rotator cuff. In particular, the medical evidence established that pain caused Trew difficulty in driving and sleeping.

Following his discharge from the rehabilitation center after 16 work-hardening sessions, there was no question that Trew could not return to his past work as a mechanic because of the continued pain he suffered. (Tr. 288.) Indeed, in a functional-capacity evaluation, Trew complained, "I cannot sleep on my right shoulder; it always aches; my hand swells and my shoulder hurts more." (Tr. 301.) At that time (April 11, 1991), "on a pain scale of one to ten, the client reports a daily level of five and a level of six-seven with increased activities." (Id.)

By June, 1991, Trew was still complaining to his physical therapist of "continued complaints of pain, both nocturnally and with overhead movement. Patient complains of arm swelling and right finger, ring finger, numbness and pain." (Tr. 315.) At that time, Trew complained of pain and numbness "with driving within 15 minutes." (Id.)

Dr. Wilkinson, the orthopedic surgeon, wrote in his notes on June 24, 1991, that "I wish he had better pain relief...." (Tr. 320.) On August 12, 1991, the day he found that Trew had reached his maximum medical improvement, Dr. Wilkinson observed, "He's still having pain and in fact feels he is worse now than he was before his operation." (Tr. 319.) On August 21, 1991, Dr. Wilkinson stated "His pain is graded at about a 4 which may prevent activity." (Tr. 355.) Wilkinson concluded that Trew "is not physically able to return to his job as a mechanic" but that he "could be released to light duty status." (Id.)

The last report from Dr. Wilkinson is dated May 12, 1992. (Tr. 347.) That report clearly documents Trew's intractable pain.

The report states in pertinent part that Trew "has been having neck and shoulder pain that has been unresponsive to physical therapy and other treatment." (Id.) The doctor stated that because Trew had "x-rays of his cervical spine that show degenerative joint disease in the cervical spine" there "certainly is a good chance his neck could have been injured by the same injury that affected his shoulder." (Id.) The doctor concluded that while Trew had done well regaining range of motion, "his pain persists." (Id.)

## F. ALJ'S CREDIBILITY FINDINGS

With regard to Trew's credibility and his claim that his impairments, singly and collectively, produced symptoms and limitations of sufficient severity to prevent sustained work activity, the ALJ found that Trew's testimony was not credible.

In particular, the ALJ repeatedly stressed that no physician had ever corroborated Trew's claim of disability. Four times the ALJ emphasized that there was no medical evidence to corroborate the testimony of Trew or his wife on the severity of Trew's injury to his right arm, stressing that the medical records did not substantiate Trew's pain claims.

The ALJ stated, "No doctor who has treated or examined the Claimant, including Dr. Wilkinson, has ever stated or suggested that he is permanently disabled or totally incapacitated." (Tr. 22.) The ALJ further stated, "No doctor ever mentioned any limitations in the Claimant's ability to stand, sit, or walk." (Id.) The ALJ emphasized that "[t]he medical records do not substantiate the Claimant's level of pain." (Id.) Discounting the testimony of Trew's wife, which corroborated that of her husband, the ALJ stated, "Third, and most important, her testimony, like the Claimant's, was inconsistent with the preponderance of the medical opinions and observations in this case." (Id. at 23.)

The ALJ had additional reasons for doubting Trew's credibility. Those reasons included the following.

Trew was released for "light work" seven months after the injury. (Id. at 22.) On August 21, 1991, Dr. Wilkinson released

Trew for light work and on that date estimated Trew's level of pain at 4. (*Id.*) Trew had no surgery other than for the rotator cuff injury and was taking pain medication infrequently. (*Id.*) Trew was able to operate a riding lawn mower. (*Id.* at 23.) There was "no evidence suggesting persistent non-exertional pain that would interfere with or diminish [Trew's] ability to concentrate." (*Id.*)

The ALJ asked the vocational expert to assume a certain degree of chronic pain which would generally preclude the use of the right arm, but then told the expert to assume that if Trew did not exceed that limitation, he "would not suffer any further work-related limitations, based upon pain alone, loss of concentration, loss of sleep or fatigue." (Tr. 143–44.)

Given the ALJ's conclusion that pain would not interfere with Trew's sleep, and also because the ALJ asked the vocational expert to assume that Trew could drive on an occasional basis, the expert testified that Trew could work as an "estimator" of auto body repair work. (*Id.*) At this point an explanation of how this testimony developed is in order.

Previously, the vocational expert had stated that Trew could not work as an estimator because "I understood the limitation was that he was limited in driving, himself." (Tr. 141.) The ALJ then asked the vocational expert to assume Trew could drive on an occasional basis. (Tr. 142.) The vocational expert testified that Trew would be required to drive approximately 20 percent of the time. (Tr. 142.) It was only then that the expert concluded Trew could work as an estimator. (Tr. 142–43.) This was the only job the vocational expert thought was available to Trew:

Q  Could he do any other work in the national economy?

A  I feel it would be very limited.

Q  Would he be able to do the estimator's job that we talked about before? Now, I've given you, driving on an occasional basis.

A  Based upon the driving on, on the occasional basis, I believe that he could do the estimator's job.

(Tr. 144.)

## G. EVIDENCE PRESENTED TO THE APPEALS COUNCIL

As indicated previously, Trew presented additional evidence to the Appeals Council. I shall summarize that evidence.

In a medical questionnaire, Mark D. Jobman, M.D., who also treated Trew for the rotator-cuff injury and repair, informed the Secretary that Trew's prognosis was "poor for recovery of use of [right] shoulder." (Tr. 397.) In the same questionnaire, Dr. Jobman indicated Trew could sit for two hours at a time and stand or walk for one hour. (*Id.*) Dr. Jobman also indicated Trew could sit for six hours during an eight-hour day and stand or walk for two hours during an eight-hour day. (*Id.*)

According to Dr. Jobman, only occasionally (zero percent to 33 percent of the time) could Trew lift or carry any weight with his right hand and arm. (*Id.* at 397–98.) The doctor felt Trew could *not* use his right hand for simple grasping, fine manipulation, medium dexterity, forearm rotational movement, power grip, pushing and pulling, or bimanual dexterity. (*Id.* at 398–99.) Dr. Jobman believed Trew was totally restricted from unprotected heights and moderately restricted when moving about machinery. (*Id.* at 399.)

Asked for his opinion as to whether Trew's impairment would prevent him from engaging in sustained, full-time employment, Dr. Jobman answered, "I believe it would severely restrict any sustained full[-]time employment. *He can't stay in any one position very long and can't use his [right] arm very much at all.*" (*Id.*) (Emphasis added.)

Trew's chiropractor, Kevin G. Howard, D.C., likewise indicated that Trew's prognosis was "[p]oor for complete use of right shoulder." (Tr. 393.) Dr. Howard felt Trew could sit for two hours at a time and stand or walk for one hour at a time. (*Id.*) Dr. Howard believed Trew could sit for up to five hours and stand or walk for up to two hours during an eight-hour day. (*Id.*) According

to Dr. Howard, Trew could occasionally lift weights of one to five pounds and six to ten pounds with his right arm, but he could never lift weights exceeding ten pounds with his right arm. (*Id.* at 393–94.) The chiropractor agreed with Dr. Jobman that Trew could not use his right hand for simple grasping, fine manipulation, medium dexterity, forearm rotational movement, power grip, pushing and pulling, or bimanual dexterity. (*Id.* at 394–95.) Dr. Howard believed Trew was totally restricted from unprotected heights and moderately restricted when moving about machinery. (*Id.* at 395.)

Asked for his opinion as to whether Trew's impairment would prevent him from engaging in sustained, full-time employment, Dr. Howard stated, "[D]ue to Mr. Trew's condition/injury, any full[-]time employment will aggravate his condition and increase symptoms. Thus I am recommend[ing that] he be restricted from any full[-]time job duties. *His right arm is almost useless due to the pain, numbness and swelling.* His condition is permanent in nature and will never be totally corrected in my opinion." (*Id.* at 396.) (Emphasis added.)

## II. MERITS AND REMEDY

I shall first examine the merits of the appeal, and then discuss the appropriate remedy.

### A. THE MERITS

■ I find there is not substantial evidence, 42 U.S.C. § 405(g) (Supp.1994), particularly after considering the new evidence, to support the ALJ's credibility assessment. The credibility assessment was critical to the determination of whether Trew could work, and since the burden of proof was on the Secretary to establish that Trew could work, given the ALJ's "step-four" findings, *Bradshaw*, 810 F.2d at 789, the denial of benefits was erroneous because it was not supported by substantial evidence.

■ In reaching this decision I am fully aware that "substantial evidence": (a) is more than a "mere scintilla," *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216–17, 83 L.Ed. 126 (1938); (b) is the amount of evidence that a reasonable mind might accept as adequate support of a conclusion, *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); and (c) is determined by reviewing the whole record. *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir.1987).

I am also sensitive to my role, which is not to decide facts anew, reweigh the evidence, or substitute my judgment for that of the Secretary. *Brockman v. Sullivan*, 987 F.2d 1344, 1346 (8th Cir.1993). Still further I recognize that the Secretary must be affirmed if her decision is based upon substantial evidence even if the "substantial" evidence would also have supported a decision for the claimant. *Steele v. Sullivan*, 911 F.2d 115, 116 (8th Cir.1990). Given these cautions, I am, nevertheless, entirely convinced that the Secretary's decision is not supported in this case by substantial evidence when the entire record is fairly considered.

1.

According to the vocational expert, the only job available to Trew was that of repair estimator. Even that job was available only if the vocational expert assumed, as the ALJ told her to do, that Trew could drive occasionally, i.e., about 20 percent of the time, and that he would not be fatigued from lack of sleep.

The ALJ made these assumptions because the ALJ doubted Trew's credibility regarding the severity of his pain, in large measure because it was not supported by medical evidence. The question then becomes "how the administrative law judge would have weighed the newly submitted reports if they had been available for the original hearing." *Riley*, 18 F.3d at 622. When this new evidence is considered, the ALJ's determination that Trew could work as an estimator is not supported by substantial evidence. (*Id.*) I arrived at this conclusion for the following reasons.

The ALJ discounted Trew's complaints of pain and resulting disability, mentioning four times the lack of medical evidence or opinion supporting Trew's claims. (Tr. 22–23.) However, in light of the medical record presented to the ALJ, supplemented by subse-

quent medical evidence presented to the Appeals Council, the ALJ's conclusions are not supportable. When the treating medical doctor and a chiropractor both opine that Trew was disabled and explain their reasons for that conclusion, the previous medical record comes into better focus.

Dr. Jobman, the medical doctor, indicated he believed Trew was severely restricted from "any sustained full[-]time employment" because "[he] can't stay in any one position very long and can't use his [right] arm very much at all." (Tr. 399.) Likewise, Dr. Howard, the chiropractor, stated that "full[-]time employment will aggravate his condition and increase symptoms," noting that Trew's "right arm is almost useless due to the pain, numbness and swelling." (Tr. 396.)

The ALJ would likely have given substantial weight to the opinions of the treating doctors to the extent the opinions were within the scope of competence of the professionals. *See, e.g., Turpin v. Bowen,* 813 F.2d 165, 170 (8th Cir.1987) ("[T]his circuit also requires the ALJ to give substantial weight to the treating physician's opinion in the evaluation process."). Whether an arm is useless or not is clearly within the scope of competence of these two treating professionals.

After giving "substantial weight" to the reports of Trew's treating professionals, the ALJ would have been confronted with the following record: (1) Trew could not perform his past relevant work; (2) given Trew's transferable skills, he could only work as an estimator; (3) the job of estimator required that Trew be able to drive approximately 20 percent of the time and not be fatigued from lack of sleep; (4) the undisputed evidence was that Trew had not had a good night's rest in over two years (a fact corroborated by his wife and the medical record); (5) the medical record was replete with constant references to uncontrolled pain, with Trew's orthopedic surgeon stating that his pain "graded at about a 4 which may prevent activity," (Tr. 355), and his pain "has been unresponsive to physical therapy and other treatment" (Tr. 347); (6) Trew was right-handed and only able to drive an hour or less and then only by using his left hand; (7) that

Trew could not use his right arm to drive was corroborated by the opinions of Dr. Jobman and Dr. Howard, both of whom indicated that Trew's right arm was useless, and (8) Dr. Howard specifically indicated the arm was useless as a result of, among other things, severe pain.

The reports of Dr. Jobman and Howard would have prohibited the ALJ from stating four times that Trew's complaints were not supported by medical opinions. Without this foundation for the ALJ's credibility assessment, the assessment is fatally weakened.

### 2.

In her original and supplemental briefs, the Secretary raises a number of arguments intended to demonstrate that even if the ALJ had considered the new medical evidence the credibility assessment would have (and should have) been the same. After carefully considering the entire record, I disagree.

The Secretary argues that neither Dr. Jobman nor Dr. Howard is competent to decide whether Trew is able to engage in "any" full-time employment because such an opinion is outside the expertise of these treating physicians. Thus, it is argued that the ALJ would have discounted the new medical evidence. The Secretary's argument in this regard misses the mark for two reasons.

I agree that treating physicians are not in a position to express expert opinions in vocational matters. *Turley v. Sullivan,* 939 F.2d 524, 527 (8th Cir.1991). However, in this case, the significance of Dr. Jobman's and Dr. Howard's opinions is specifically related to the use of Trew's right arm. This is an area in which the physician and the chiropractor are clearly entitled to express their opinions. The fact that both doctors believe Trew's right arm is essentially useless substantially detracts from the vocational expert's assumption that Trew would be able to drive a car during his work as an estimator.

It seems unreasonable to suggest that someone would hire Trew as an estimator, with the understanding that he must drive 20 percent of the time, knowing he could not use his dominant arm in the operation of a motor vehicle. Trew's ability to perform the job of an estimator must be evaluated in light of the

competitive realities of the work place. *Gavin v. Heckler*, 811 F.2d 1195, 1198 n. 3 (8th Cir.1987); *Douglas v. Bowen*, 836 F.2d 392, 396 (8th Cir.1987). The competitive realities of the work place are such that it is doubtful that an employer would hire Trew as an estimator if the employer knew that a treating physician and a chiropractor were of the opinion that Trew's dominant right arm was useless, given the fact that Trew would be required to drive an automobile up to 20 percent of the time.

As a consequence, while the ALJ would not be obligated to give credence to the opinions of Dr. Jobman and Dr. Howard insofar as these experts spoke of purely vocational matters, the ALJ would have been obligated to consider their opinions insofar as Trew's ability to use his right arm is concerned.

Moreover, the Secretary's argument in this regard is disingenuous. It was the *ALJ* who doubted Trew because: "No doctor who has treated or examined the Claimant, including Dr. Wilkinson, has ever stated or suggested that he is permanently disabled or totally incapacitated." (Tr. 22.) The reports of Dr. Jobman and Dr. Howard are directly responsive to this criticism. It is, therefore, odd that the Secretary now faults Trew for providing what the ALJ faulted Trew for failing to provide.

Next the Secretary argues that the ALJ would not have been impressed with the opinions of Dr. Jobman and Dr. Howard because there were inconsistencies in the record presented to the ALJ which were more persuasive and indicated a lack of disabling pain. I shall examine each of these alleged "inconsistencies".

The Secretary notes that at various times Trew was released for light duty. However, this point is not persuasive of anything relevant. The critical question was not whether Trew could engage in "light duty"—the critical question was whether he could use his right arm given the pain he suffered. That Trew was released to light duty says nothing about whether he could use his right arm. In turn the light duty point says nothing about whether Trew could perform the job of an estimator.

This point is sharply illustrated by what Trew's orthopedic surgeon stated. When the doctor released Trew for light duty, the doctor nevertheless observed that Trew's pain "may prevent activity." (Tr. 355.) Indeed, the last report from this doctor indicated that Trew's pain was "unresponsive" to treatment and "persists." (Tr. 347.)

The Secretary next points out that the ALJ was impressed with the fact that Dr. Wilkinson graded Trew's pain at four, but Trew himself estimated his pain at higher levels. Once again, when the record is fairly examined, this argument is unimpressive. While Dr. Wilkinson did grade Trew's pain at four, the ALJ failed to note that Dr. Wilkinson *clearly cautioned in the same sentence* that this level of pain "may prevent activity." (Tr. 355.)

Next the Secretary argues that the ALJ was properly impressed by the fact that Trew had no other surgery. I simply do not understand this point. There was no medical opinion offered that Trew ever needed more surgery.

The Secretary also argues that Trew's infrequent use of medication and the lack of severe adverse side effects related to said medication support the ALJ's determination that Trew did not suffer disabling pain. This argument is simply not supported by a fair reading of the record.

Dr. Wilkinson clearly stated that Trew's pain was "unresponsive to physical therapy *and other treatment.*" (Tr. 347.) (Emphasis added.) Dr. Wilkinson also stated, "I wish he had better pain relief...." (Tr. 320.) Moreover, on the day he found that Trew had reached maximum medical improvement, Dr. Wilkinson observed that "[h]e's still having pain and in fact feels he is worse now than he was before his operation." (Tr. 319.)

Furthermore, Trew testified that even with medication his pain level was still five or six on a scale of ten. (Tr. 75.) Trew's wife testified that he had adverse reactions to Vicodin and Percocet in the form of nightmares and the feeling "he's got little bugs crawling on him." (Tr. 122.) Trew testified that Advil made his ears ring. (Tr. 76.)

Trew also testified that because he was instructed to take his prescription Motrin not more frequently than once every four hours, he used the drug in a seemingly reasonable fashion by limiting its use to situations where the pain was especially severe. (Tr. 77.) On this record, it is nearly impossible to conclude that Trew's pain could be remedied by medication, which is, of course, the point the Secretary wishes to establish.

The Secretary next argues the ALJ properly found that Trew's "range of activities, notwithstanding his alleged impairments," supported the decision to discount Trew's pain. It is particularly noted that the ALJ found that Trew's testimony about his difficulty driving was not credible because he "testified that he could operate a riding lawnmower, an activity that requires far more jarring and vibration to the body than does ordinary automobile driving, and which requires a lot of turning of the neck as well." (Tr. 23.)

This argument is not based upon a fair reading of the record. Specifically, this argument ignores Mrs. Trew's observation that when her husband did operate the riding lawn mower, "the next day, he walks around holding his shoulder." (Tr. 123.) Moreover, it appears that Trew did not frequently mow the lawn. Mrs. Trew testified that lawn mowing was "generally my job," not her husband's. (Tr. 124.) The ALJ failed to mention Mrs. Trew's testimony on these points. As a result, the ALJ's reliance on Trew's testimony about the riding lawn mower is not a persuasive reason for discounting Trew's credibility about the severity of his pain because Trew did not mow frequently and, when he did, he suffered significant pain.

The Secretary points out that the ALJ also observed there was "no evidence suggesting persistent non-exertional pain that would interfere with or diminish the Claimant's ability to concentrate." (Tr. 23.) However, this statement is, once again, not a fair statement of the whole record. There was substantially unchallenged testimony that Trew was al-. ways in pain, whether or not he exerted himself, and that he had not experienced a good night's rest in two years. (Tr. 110.)

The medical record repeatedly recorded complaints of pain during sleep that was sufficiently intense that it awoke Trew (Tr. 301, 315). Mrs. Trew confirmed that he frequently woke up three times a night as a result of the pain. (Tr. 120–21.) When asked by the ALJ whether he had "pain there all the time," Trew responded, "Right." (Tr. 74.) When asked to gauge the pain he had "there all the time," Trew testified that on a scale of one to ten, his pain that was "there all the time" was "5 or 6 probably." (Tr. 74.) When asked what happened when he engaged in activities such as merely "raising your arm or lifting something," Trew said his pain level increased to "[p]robably 8 or 10." (Tr. 74.) Trew's wife gave an example of Trew sitting in a chair at their home on the day of the hearing and suffering pain with the slightest of movements. (Tr. 119–20.) Dr. Howard stated, "His right arm is almost useless due to the pain...." (Tr. 396.) Dr. Jobman confirmed that he "can't use his [right] arm very much at all." (Tr. 399.) Dr. Wilkinson, the orthopedic surgeon, cautioned that Trew's pain "may prevent activity." (Tr. 355.)

After a review the entire record, there is no substantial evidence which would support the ALJ's statement that there was "no evidence suggesting persistent non-exertional pain that would interfere with or diminish the Claimant's ability to concentrate." (Tr. 23.) How a man who had not slept well for two years due to persistent nonexertional pain could be expected to concentrate is a relevant question neither asked nor answered by the ALJ and the Secretary.

**3.**

In summary, there are substantial factors which support Trew's credibility regarding his disabling pain: (1) Trew had a long and continuous past work record with no evidence of malingering; (2) Trew's testimony regarding his pain was corroborated by his wife; (3) there were frequent references in the medical record about Trew seeking help for his pain; (4) the onset of Trew's pain was specifically related to the rotator cuff injury which required surgical repair; and (5) Trew's report of pain was consistent with the medical opinions of Dr. Wilkinson, Dr. Job-

man and Dr. Howard. In contrast, there is very little in the record to support an adverse credibility finding.

Only by rejecting Trew's credibility with regard to complaints of pain in his arm was the ALJ able to find that Trew could work at the one job available to him. Since pain essentially rendered Trew's dominant right arm useless in driving an automobile, and since pain interfered with Trew's sleep virtually every night, it is very doubtful that Trew could maintain employment as a repair estimator when such a job would require him to drive an automobile up to 20 percent of the time and be well rested.

When the opinions of the two treating professionals which were presented to the Appeals Council are added to the medical evidence previously presented to the ALJ, the evidence of disabling pain does not appear to be in conflict and must therefore be given proper weight. *Holland v. Heckler*, 768 F.2d 277, 281–82 (8th Cir.1985). In turn, the ALJ's credibility findings must be supported by substantial evidence. *Hardin v. Heckler*, 795 F.2d 674, 676 (8th Cir.1986). When the evidence of disabling pain is given proper weight, the ALJ's credibility finding is not supported by substantial evidence. Since the burden of proof was on the Secretary to establish that Trew could work, and since that finding was predicated on Trew's lack of credibility, the absence of substantial evidence to support the credibility finding dictates that Trew is entitled to relief.

### B. REMEDY

■ As observed earlier, this case presents this court with "a peculiar task" because the court "must speculate to some extent on how the administrative law judge would have weighed the newly submitted reports if they had been available for the original hearing." *Riley v. Shalala*, 18 F.3d at 622. Moreover, I am aware that "questions of fact, including the credibility of a claimant's subjective testimony, are primarily for the Secretary to decide, not the courts." *Benskin v. Bowen*, 830 F.2d 878, 882 (8th Cir.1987). Although I am satisfied that the record will not support

the ALJ's credibility determination given the evidence presented to the Appeals Council, it is not my function to ultimately determine that Trew is credible. Rather, that is for the Secretary to determine. Thus, given the peculiar role this court plays in cases such as this, I believe a judgment remanding this case to the Secretary is the appropriate remedy, rather than a judgment directing that benefits be awarded.

Accordingly,

IT IS ORDERED that judgment will be entered by separate document providing that, pursuant to sentence four of 42 U.S.C. § 405(g),[1] the decision of the Secretary is reversed and this case is remanded to the Secretary for reconsideration of the claimant's credibility and for a redetermination of whether the claimant can perform the work of an estimator.

---

1. For an explanation of the need for a separate judgment, particularly when an application for attorney fees must be filed, *see Sorich v. Shalala*, 838 F.Supp. 1354 (D.Neb.1993).