**William R. DOBSON, Plaintiff,**

v.

**Shirley S. CHATER, Commissioner of Social Security, Defendant.**

**No. 4:CV95–3125.**

United States District Court, D. Nebraska.

May 31, 1996.

Glen A. Murray, Grand Island, NE, for Plaintiff.

Susan L. Knight, Assistant U.S. Attorney, Lincoln, NE, for Defendant.

## MEMORANDUM AND ORDER

KOPF, District Judge.

This is a social security case in which the Appeals Council considered newly submitted evidence not considered by the administrative law judge (ALJ). This factor complicates the review of the ALJ's decision to deny benefits because the court "must speculate to some extent on how the administrative law judge would have weighed the newly submitted reports if they had been available for the original hearing." *Riley v. Shalala*, 18 F.3d 619, 622 (8th Cir.1994). *See also Trew v. Shalala*, 861 F.Supp. 860 (D.Neb. 1994).

Considering this case as upon cross-motions for summary judgment I shall grant summary judgment in favor of William R. Dobson (Dobson). I find that there is not substantial evidence in the record as whole, particularly after considering the new evidence, to support the decision that Dobson, who has severe problems associated with a brain tumor, should be denied benefits. Accordingly, I shall remand this case for reconsideration.

## I. BACKGROUND

I will briefly describe the ALJ's decision, and then I will review the decision of the Appeals Council.

## A.

By reference to the five-step sequential evaluation process, *Bowen v. City of New York,* 476 U.S. 467, 470–71, 106 S.Ct. 2022, 2024–25, 90 L.Ed.2d 462 (1986), I will summarize the ALJ's finding.

First, the ALJ decided that since January 1, 1993 (the alleged onset date of the disability) Dobson had not performed substantial gainful work. (Tr. 28.) Thus, the ALJ proceeded to the second step. (Tr. 28.)

At the second step the ALJ found that Dobson, who was then a 45 year-old farmer, suffered from "medically determinable severe impairments" including: (1) the residual impact of the 1988 surgical removal of a portion of a large brain tumor (the bulk of the tumor was removed but a part of the tumor remained and encased the left carotid artery and left optic nerve); (2) blindness in the left eye; (3) loss of hearing in the left ear; (4) seizures; and (5) mild dementia. (*Id.*)

At the third step the ALJ found that Dobson was not claiming that his impairments meet the so-called "listing of impairments" set forth in the social security regulations, but even if Dobson had made such a claim "it would not have been supported by the clinical and laboratory findings of record." [1] (*Id.*) Nevertheless, the ALJ found that such impairments as Dobson suffered from imposed significant non-exertional limitations upon his ability to function. (*Id.*)

At the fourth step the ALJ found that Dobson was unable to return to his past relevant work as a farmer. (*Id.*)

Fifth, and finally, the ALJ found that Dobson and his wife were not credible regarding Dobson's subjective complaints, that setting those subjective complaints aside Dobson had the residual functional capacity to perform certain unskilled occupations which existed within the geographic region in which he resided (such as hand packager), and that Dobson was therefore not disabled within the meaning of the law. (*Id.* at 28–29.)

Dobson had claimed that his impairments totally incapacitated him because he suffered from severe headaches, significant and uncontrolled temper outbursts when stressed, and substantial short term memory problems all of which made it impossible for him to work. (*Id.* at 20–27.) The ALJ found that the "[c]linical laboratory" evidence was "generally consistent" with Dobson's testimony. (*Id.* at 24.) The ALJ further acknowledged that a psychologist's report supported Dobson's testimony. (*Id.* at 27.) The ALJ also recognized that Dobson's wife corroborated her husband. (*Id.* at 21–22.) Finally the ALJ admitted that a vocational expert had testified that if Dobson really had these problems Dobson would not be able to engage in substantial and gainful activity of any kind. (*Id.* at 27.)

However, the ALJ concluded, among other things, that "the medical evidence in the record ... does not support the Claimant's allegation of total disability." (*Id.* at 24.) Based in large part upon this lack of medical evidence, the ALJ found under *Polaski v. Heckler,* 739 F.2d 1320, 1321–22 (8th Cir. 1984), that Dobson and his wife were not credible, and that Dobson had the residual functional capacity to do certain work which was available to him in the area in which he lived. (Tr. at 22–28.) As earlier noted, the ALJ further held that Dobson had not claimed that his impairments fit the "listing of impairments" set forth in the social security regulations, but that if Dobson had made such an argument "it would not have been supported by the clinical and laboratory findings of record." (*Id.* at 25.) Therefore, on August 8, 1994 the ALJ denied Dobson's claims for benefits. (*Id.* at 29.)

## B.

On October 5, 1994 Dobson's lawyer, after perfecting an appeal to the Appeals Council, submitted new evidence to the Council. (Filing 8.) The new evidence included the following:

1. A letter dated September 7, 1994, from the surgeon and neurologist (Dr. Eric Pierson) who had removed part of the tumor from Dobson in 1988, which stated that (a) the doctor had reviewed a letter from Dobson's parents dated August 16, 1994; (b) the doctor had discussed the situation with Dobson's wife; (c) the doctor had examined Dob-

---

**1.** *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.02 (1995) (Organic Mental Disorders).

son on September 2, 1994; (d) the doctor was of the opinion to a reasonable degree of medical certainty that Dobson suffered from "impaired memory and mental function to the point that he is not employable in a competitive environment"; (e) Dobson's condition was "due to his brain tumor which . . . impairs the function of the frontal lobes of the brain"; (f) the condition had lasted for a year; and (g) "I don't expect significant improvement in the future." (Filing 8, Pierson letter, Sept. 7, 1994.)

2. The doctor's notes of the September 2, 1994 visit, which included a statement that the doctor had reviewed the letter from Dobson's parents which described "poor attention span, poor recent memory, frustration . . . in dealing with his limited memory and general low level of functioning" which "fits perfectly with my observations and expectations based on his known meningioma [2] that involves impairment of the frontal lobes of the brain." (Filing 8, Pierson notes, Sept. 2, 1994.)

3. A detailed medical questionnaire pertaining to the "time period from January 1, 1993 to August 8, 1994" which set forth the doctor's specific opinion that Dobson suffered from an organic mental disorder as defined in the "Listing of Impairments" found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.02 (1995). (Filing 8, Medical Questionnaire, Sept. 2, 1994.)

4. A copy of the handwritten letter that the doctor had reviewed from Dobson's parents. (Filing 8, Mr. & Mrs. Reginald Dobson letter, Aug. 16, 1994.)

On February 9, 1995 the Appeals Council ruled, affirming the decision of the ALJ. (Tr. 7–9.) In so doing the "Appeals Council also considered the report from Eric W. Pierson, M.D." (*Id.* at 7.) Essentially, the Council found that the new evidence was not persuasive for three reasons.

1. The "information provided by Dr. Pierson does not relate to the issue of whether you were disabled beginning on or before August 8, 1994" (*id.* at 7.)

2. While the doctor indicated that "you had impaired memory and mental function

which would prevent you from working . . . the report did not give any additional medical evidence for the time at issue" (*id.* at 7–8.)

3. Even though "the doctor also indicated that he believed your condition had lasted a year, there is no indication in the record that you had seen this doctor from January 6, 1993 until the current evaluation," "no intervening medical records have been submitted," and "the prior medical reports from this source were considered in the decision and there is no mention of memory deficits or severe functional limitations at that time." (*Id.* at 8.)

## II. DISCUSSION

Due to the unusual posture of this case I shall remand this case for another hearing by the ALJ. I do so because I find and conclude that there is not "substantial evidence" in the record as a whole to support the step–3 finding by the ALJ that Dobson did not meet or exceed the criteria for the impairment known as "organic mental disorder" as defined in the "Listing of Impairments" found in 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.02 (1995).

In particular, I find that the ALJ's statement that such an impairment is not "supported by the clinical and laboratory findings of record" (Tr. at 25) is untrue given the information submitted to the Appeals Council, specifically the opinion of the treating brain surgeon which is supported by his clinical notes and by responses to a detailed medical questionnaire. If Dobson suffered from an "organic mental disorder" as defined in the regulations then Dobson's condition would be "considered as a matter of law" to be " 'so severe as to preclude substantial gainful activity.' " *Riley,* 18 F.3d at 621 (*quoting Bowen v. Yuckert,* 482 U.S. 137, 141, 107 S.Ct. 2287, 2291, 96 L.Ed.2d 119 (1987)).

In arriving at these findings and conclusions I have applied the following principles. First, in determining whether there is "substantial evidence" to support the decision of the ALJ [3] I recognize that: (a) sub-

---

**2.** This means a tumor that originates in brain or spinal tissue. *Steadman's Medical Dictionary* 848 (4th Lawyers' ed. 1978).

**3.** It is the decision of the ALJ which is reviewed and not the Appeals Council. *Riley,* 18 F.3d at 622.

stantial evidence is more than a "mere scintilla"; (b) substantial evidence is the amount of evidence that a reasonable mind might accept as adequate as support of a conclusion; and (c) substantial evidence is determined by reviewing the whole record. *Trew,* 861 F.Supp. at 866 (citations omitted). Second, I also realize that: (a) my role is not to decide the facts anew, my role is not to reweigh the facts anew, and my role is not to substitute my judgment for the judgment of the ALJ; and (b) the decision of the defendant must be affirmed. if it is based upon substantial evidence even if the evidence would also support a decision for the claimant. *Id.* (citations omitted).

### A.

■ When the ALJ made the step–3 decision he erroneously believed that Dobson was not claiming that the claimant fit within a "listed impairment." If Dobson was in fact so impaired then the claimant was entitled as a matter of law to a finding at step–3 that he was disabled. *Bowen v. Yuckert,* 482 U.S. at 141, 107 S.Ct. at 2291. ("If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled"). The ALJ wrongly believed that Dobson was not making such a claim apparently because there was an absence of medical evidence specifically reciting the language of the impairment regulation. This evidently caused the ALJ to state that even if such a claim had been made it would not have been "supported by the clinical and laboratory findings of record." (Tr. at 28.)

The difficulty with the ALJ's finding—that Dobson was not making a claim which fit within a listed impairment category and even if he was there was no clinical or laboratory findings of record to support such a claim—is that this finding and hence the ALJ's critical step–3 conclusion is not supported by "substantial evidence" when the new evidence is considered with the record as a whole. The new evidence specifically pertaining to the "time period from January 1, 1993 to August 8, 1994" set forth the treating brain surgeon's detailed opinion that Dobson suffered from an organic mental disorder as defined in the social security regulations. *Compare* 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.02 [hereinafter "Regs."] *with* (Filing 8).

The new evidence also established that the condition had lasted at least one year. (Filing 8, Pierson letter, Sept. 7, 1994.)

The evidence from the doctor followed the social security regulations very precisely. Among other things, the doctor responded to a fairly drafted questionnaire which tracked the pertinent regulation exactly and which gave the doctor an opportunity to specifically and objectively respond to each of the regulatory criteria for "organic mental disorders". (Filing 8, Medical Questionnaire, Sept. 2, 1994.) For the sake of clarity I shall set forth in tabular form the regulatory requirements and a comparison of those requirements with the evidence:

*Regulatory Requirement:*

"Psychological or behavioral abnormalities associated with a dysfunction of the brain." Regs. § 12.02 (Introduction).

*Evidence:*

The doctor stated that Dobson suffered from "impaired memory and mental function to the point that he is not employable in a competitive environment." (Filing 8, Pierson letter, Sept. 7, 1994.)

*Regulatory Requirement:*

Shown by "[h]istory and physical examination". Regs. § 12.02 (Introduction).

*Evidence:*

The doctor stated he examined Dobson and took a history from the wife and parents. (Filing 8, Pierson letter, Sept. 7, 1994; Pierson notes, Sept. 2, 1994.) (Of course, evidence already in the record established that the doctor was the one who removed the tumor and later treated Dobson from 1988 through 1994).

*Regulatory Requirement:*

Which "demonstrate the presence of a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities". Regs. § 12.02 (Introduction).

*Evidence:*

The doctor stated the condition was "due to his brain tumor which . . . impairs the function of the frontal lobes of the brain". (Filing 8, Pierson letter, Sept. 7,

1994.) Indeed the doctor believed the history derived from the family showing "poor attention span, poor recent memory, frustration ... in dealing with his limited memory and general low level of functioning ... fits perfectly with my observations and expectations based on his known meningioma that involves impairment of the frontal lobes of the brain." (Filing 8, Pierson notes, Sept. 2, 1994.)

*Regulatory Requirement:*

The impairment must last or be expected to last for a continuous period of one year. 20 C.F.R. § 404.1505(a).

*Evidence:*

The doctor stated that the condition had lasted for a year and "I don't expect significant improvement in the future." (Filing 8, Pierson letter, Sept. 7, 1994.)

*Regulatory Requirement:*

The condition must be sufficiently severe such that at least one of the following exist: (1) disorientation as to time and place; (2) memory impairment (short, intermediate or long term); (3) perceptual or thinking disturbances; (4) change in personality; (5) disturbance in mood; (6) emotional lability, such as explosive temper outbursts and impairment in impulse control; or (7) loss of measured intellectual ability of at least 15 points or overall impairment clearly within the severely impaired range on certain tests. Regs. § 12.02A.

*Evidence:*

The doctor explicitly stated that Dobson met at least 6 out of the 7 criteria, to wit: memory impairment; perceptual or thinking disturbances; changes in personality; disturbance in mood; emotional lability; and loss of measured intellectual ability. According to the doctor his medical findings in this regard were supported by "known brain tumor involving frontal lobe of brain" and "history of current function obtained from family". (Filing 8, Medical Questionnaire, Sept. 2, 1994 at Questions 5(a), (b)(1)–(7), (c).)

*Regulatory Requirement:*

The condition must be sufficiently severe such that at least two of the following exist: (1) marked restriction of activities of daily life; (2) marked difficulties in maintaining social functioning; (3) deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in timely manner; (4) repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms. Regs. § 12.02B.

*Evidence:*

The doctor explicitly stated that Dobson's condition satisfied all four of the criteria, to wit: "marked" restriction of activities of daily living; "marked" difficulties in maintaining social functioning; "constant" deficiencies in concentration or pace resulting in failure to complete tasks in a timely fashion; "continual" episodes of deterioration or decompensation in work or work-like setting which cause withdrawal or exacerbation of signs and symptoms. According to the doctor his medical findings in this regard were supported again by "known brain tumor involving frontal lobe of brain" and "history of current function obtained from family". (Filing 8, Medical Questionnaire, Sept. 2, 1994 at Questions 6(a)–(b).)

For the time period between the alleged onset (January 1, 1993) and the date of the ALJ's decision (August 8, 1994) the medical evidence already in the record was consistent with the "new" evidence. Essentially, the "old" evidence when read in light of the opinion of the treating surgeon substantially corroborated Dobson's claim that he was entitled to a step–3 determination of disability.

For example, Dr. Pierson's medical records for the time period before the doctor's September, 1994 examination but after the date of alleged onset showed that in January of 1993 Dobson was examined by Dr. Pierson and a CAT scan was done. (Tr. 269.) In that medical record the doctor noted the although it was his impression that the scan showed no change of the size of the original tumor Dobson was having headaches, his "headaches seemed worse," and thus the doctor was contemplating "resection of the tumor with carotid bypass but the tumor

seemed to go beyond the carotid bifurcation so I am not sure that's feasible." (Tr. 269.) A radiologist found the original mass was unchanged but added that there was another mass at the "fossa floor" that "may represent an additional meningioma," there were "post-operative changes in the left frontal lobe," and there was mass at the right optic nerve that might be an "additional meningioma focus." (Tr. 277.)

A consulting doctor engaged by a social security examiner saw Dobson on or shortly before March 10, 1993. (Tr. 283–84.) Among other things the doctor stated that Dobson "likely has residual meningioma which may be causing some inflammatory and edematous effects on the brain," that "[s]ome degree of frontal lobe syndrome may be present" and that "[m]ost assuredly his mental status does not appear normal." (Tr. 284.) Dobson was "slow to respond," "hesitant in communication" and his "short-term memory is only fair." (*Id.*) Although the doctor believed that Dobson was essentially intact neurologically and could perform "simple tasks" and operate "simple machinery," the doctor recommended "a neuropsychiatric evaluation with psychological testing for degree of memory impairment and overall sensorium dulling." (*Id.*)

Apparently in response to the March 10, 1993 recommendation for further tests, Dobson was sent by a social security examiner to Dr. John J. Curran, Ph.D. for a psychological examination and psychometric testing. (Tr. 285–89.) On April 6, 1993 Dr. Curran, after a clinical interview with Dobson, an interview with Dobson's wife, administration of the Wechsler Memory Scale (Revised) and a review of the medical records supplied by the government, came to a diagnostic impression (Tr. 289.)

First, "it appeared quite noticeably that Mr. Dobson is showing impairment in both short term and long term memory," and Dobson had "a great deal of difficulty with short term verbal information, and he had much difficulty recalling many historical dates from both his personal life and past current events." (Tr. 289.) Second, based upon the history provided by Dobson's wife Dr. Curran believed that "there has been a significant personality change in that he has a very quick temper now." (*Id.*) Finally,

Dr. Curran believed that "[t]here appears to be evidence that there was a specific organic factor, a brain tumor which required surgery in 1988. Therefore, this examiner would offer the diagnosis provisionally of dementia, mild (294.10), secondary to brain tumor and surgery." (*Id.*)

The doctor's reference to "294.10" is apparently a reference to "dementia due to a specified medical condition" in the *Diagnostic and Statistical Manual of Mental Disorders* (3d ed. revised 1987) ("DSM III–R"). Subsequent to the doctor's examination but prior to the decision of the ALJ the DSM III–R numbering system was changed. "Dementia secondary to brain tumors" now bears the code 294.1 in the *Diagnostic and Statistical Manual of Mental Disorders* 151–52, 777 (4th ed. 1994) ("DSM IV") which supplanted the DSM III–R in May of 1994.

The diagnostic criteria for dementia secondary to a brain tumor are: (a) multiple cognitive deficits (both memory and such things as disturbance in planning or organizing); (b) the cognitive deficits each cause "*significant impairment*" and decline in social or *occupational functioning;* (c) there is evidence, such as from a physical examination, that the disturbance is a direct physiological consequence of the specified medical condition; and (d) the deficits do not occur exclusively during the course of delirium. *DSM IV* at 151–52 (emphasis added).

That Dobson's impairment was "significant" and adversely impacted upon his "occupational functioning" is evidenced by the doctor's response to a questionnaire apparently prepared by a social security examiner. (Tr. 290.) In answer to that questionnaire Doctor Curran indicated that: Dobson suffered from a restriction of activities of daily living; Dobson suffered from recurrent episodes of deterioration when stressed which result in withdrawal from the situation or exacerbation of symptoms; Dobson lacked an ability to sustain concentration and attention needed to complete tasks; Dobson lacked the ability to understand and remember short and simple instructions under ordinary supervision; and Dobson lacked the ability to adapt to changes in his environment. (*Id.*)

The questions which prompted these answers were taken virtually verbatim from the social security regulations dealing with organic mental disorders. *See* Regs. § 12.02B. Significantly, Dr. Curran's answers were very similar to those given by Dr. Pierson to similar questions. *Compare* (Tr. 290) (Dr. Curran's answers to questionnaire, Mar. 30, 1993) *with* (Filing 8, Dr. Pierson's answers to Medical Questionnaire, Sept. 2, 1994.)

All of the information suggesting that Dobson suffered from an "organic mental disorder," including the most recent information provided by Dr. Pierson, was supported by "medical evidence consisting of signs, symptoms, and laboratory findings, not only [Dobson's own] statement of symptoms." 20 C.F.R. § 404.1508. Such things as the location and partial surgical removal of a brain tumor, the 1993 CAT scan showing the remaining portion of the tumor and possible additional tumors, the post-operative changes in the frontal lobe of the brain as revealed by the CAT scan, and the deficits evidenced by the memory measurement tests conducted by Dr. Curran in 1993 are precisely the type of objective "signs" 20 C.F.R. § 404.1528(b), and "laboratory findings" 20 C.F.R. § 404.1528(c), that are called for under the social security regulations.

In sum, the ALJ's step–3 finding—that Dobson was not claiming that his impairments meet the so-called "listing of impairments" set forth in the social security regulations, but even if Dobson had made such a claim "it would not have been supported by the clinical and laboratory findings of record"—is not supported by "substantial evidence" in the record as a whole when the new information is considered.

## B.

The government makes a number of arguments in an effort to sustain the decision of the ALJ. I am not persuaded by any of these arguments, and I mention, albeit briefly, only those arguments that merit a response.

■ First, the government argues that Dobson's new evidence should not be considered because it is untimely and Dobson has not shown good cause for failure to submit the new information to the ALJ. This argument lacks merit because the Appeals Council considered the new evidence on the merits, and that being true this court is required to consider the new evidence as if it had been presented to the ALJ. *Riley v. Shalala,* 18 F.3d at 622 ("Once it is clear that the Appeals Council has considered newly submitted evidence ... our role is limited to deciding whether the administrative law judge's determination is supported by substantial evidence on the record as a whole, including the new evidence submitted after the determination was made").

■ Second, the government argues that various bits and pieces of the record support the ALJ's determination and thus this court should not substitute its judgment for the judgment of the ALJ. There are at least two responses to this argument and both responses render the government's argument unpersuasive.

Initially there is *no* evidence, save for Dr. Pierson's opinion letter and his answers to the medical questionnaire, which specifically addresses each of the elements of the complex question of whether or not Dobson suffered from an "organic mental disorder" as defined in the social security regulations. This is probably because the ALJ wrongly assumed that Dobson was not making a claim that he fit within one of the "listed impairments." In any event, Dr. Pierson's detailed opinion, which precisely tracks each element of the "organic mental disorder" impairment regulation, remains uncontradicted in the record. Moreover, much of the evidence that the government now relies upon predates the onset date alleged by Dobson, and therefore such evidence is not directly relevant to the time period under consideration.

■ Third, the government argues that Dr. Pierson did not treat Dobson enough times so as to have a sufficient foundation upon which to express a competent medical opinion. I disagree with the factual predicate for this argument because the record (Tr. 241, 268–274; filing 8) reveals that the doctor removed the tumor and thereafter rendered treatment to Dobson on about a yearly basis from the time of the surgery through and after the date of the ALJ's decision; during this time the doctor pre-

scribed medications, including pain medication, for Dobson; the doctor consulted with other doctors regarding his and their treatment of Dobson; the doctor dealt with Dobson's wife; and the doctor on at least four occasions examined CAT scans of Dobson.

Fourth, like the Appeals Council the government continues to maintain that Dr. Pierson's "new" evidence was based upon information that post-dated the ALJ's decision and therefore the doctor's opinion is outside the relevant time frame. Once again, I disagree with the factual predicate for this argument. While the doctor did examine Dobson in September of 1994 after the ALJ's August of 1994 decision, the fact is that the doctor's opinion is explicitly directed to the "time period from January 1, 1993 to August 8, 1994." (Filing 8, Medical Questionnaire, Sept. 2, 1994 at Question 2 instructions.) It is further clear that the doctor was actively engaged in the treatment of Dobson's tumor condition from the time of the 1988 surgery through and after the date of the ALJ's decision.

Fifth, the government argues that Dr. Pierson's opinion is only based upon what Dobson (or his family) told the doctor, and the doctor's opinion is not corroborated by objective medical evidence. As indicated earlier, this is not this case. Such things as the location and partial surgical removal of a brain tumor, the 1993 CAT scan showing the remaining portion of the tumor and possible additional tumors, the post-operative changes in the frontal lobe of the brain as revealed by the CAT scan, and the deficits evidenced by Dr. Curran's 1993 memory measurement tests are the type of objective "signs" 20 C.F.R. § 404.1528(b), and "laboratory findings" 20 C.F.R. § 404.1528(c), that fully satisfy the social security regulations and support Dr. Pierson's opinion. 20 C.F.R. § 404.1508.

In sum, none of the arguments presented by the government are persuasive. More specifically, none of the government's arguments point out "substantial evidence" in the record as a whole which fairly support the ALJ's step–3 finding that Dobson failed to satisfy the regulatory criteria for the listing "organic mental disorder."

## C.

A word about the appropriate remedy is in order. Remand, as opposed to an outright award of benefits, is the appropriate remedy in this case. Because the ALJ assumed that Dobson was not making a claim regarding a listed impairment and because Dr. Pierson's "new" evidence was not first submitted to the ALJ, the ALJ was not given a full and fair opportunity to evaluate Dobson's claim. To avoid undue speculation about what the ALJ would have done with the "new" evidence, *see Riley v. Shalala*, 18 F.3d at 622, remand is the appropriate remedy because questions of fact (such as whether someone is disabled) are primarily for the ALJ and not this court. *Trew v. Shalala*, 861 F.Supp. at 870.

Accordingly,

IT IS ORDERED that judgment will be entered by separate document providing that pursuant to sentence four of 42 U.S.C. § 405(g) the decision appealed from is reversed and this case is remanded to the Commissioner of Social Security for reconsideration of whether the claimant is entitled to a finding that he is disabled and for resolution of such other subsidiary questions as may be appropriate.