Mary E. CALLISON, Plaintiff,

v.

John J. CALLAHAN, Ph. D., Acting
Commissioner of Social Security,
Defendant.

No. 4:96CV3392.

United States District Court,
D. Nebraska.

Dec. 5, 1997.

Warren L. Reimer, Norfolk, NE, for Plaintiff.

Susan L. Knight, Asst. U.S. Atty., Lincoln, NE, for Defendant.

## MEMORANDUM AND ORDER

KOPF, District Judge.

Mary E. Callison (Callison), a registered nurse, appeals from the decision of an administrative law judge (ALJ) denying her applications for supplemental security income based on disability and for disability insurance benefits. After careful review, I will reverse the decision appealed from and remand for further proceedings consistent with this opinion.

### I.

### A.

By September 28, 1994, when Callison claimed that she could no longer work as a nurse, she had continually practiced her profession for fourteen years. Her last employer described her work this way: "Wonderful rapport with residents, but did not keep up with the demands." (Tr. 206.)

During the previous fourteen years, Callison had risen from a licensed practical nurse to a registered nurse. She had served in various responsible positions from a floor nurse to director of nursing at a nursing home. However, by the time Callison was fifty-nine years old, she told her doctor that "she could not lift, bend, or stand on her legs for prolonged periods of time." (Tr. 192.)

In addition, Callison, who is five feet two inches tall and weighs 212 pounds, testified that she suffered severe arthritic-like pain in all of the joints of her legs nearly every day of the week. (Tr. 41–48.) She further testified that she could not sit for more than thirty minutes and after that time she was required to stand and walk to relieve the hip pain. She also testified that she could walk up to three blocks but the pain then hurts down to her knees and she must sit. She can

stand for about thirty minutes, but then she must walk or sit to ease the pain. Additionally, she testified that to relieve the pain during the day she normally rested in bed for an hour.

Callison worked until she was fifty-nine years of age. Six years before, she "had her right hip replaced in June of 1988 due to severe degenerative joint disease." (Tr. 192) (Consulting physician's medical report dictated March 15, 1995.) There is no dispute about the severity of the disease that caused this surgery.

Despite this hip replacement, Callison continued to work. She worked though her surgeon placed a 25–pound Lifting restriction on her activities. Such a restriction interferred with her ability to lift patients, and thus made it difficult to find and keep work.

The medical records reveal repeated efforts by Callison to continue her nursing work despite the hip replacement and lifting restrictions. (*Id.* at 169 (October 1988) and 170 (September 1988)). For example, when she had her hip replaced she scheduled the surgery during her vacation "so that she can miss as little work and as little schooling [she was. pursing her RN degree] as possible." (*Id.* at 174.)

When they replaced her right hip, Callison "was advised at that time that her l[e]ft hip may also require eventual surgical replacement." (*Id.* at 192.) This was apparently because Callison's "severe degenerative joint disease" would somehow implicate the left hip. (*Id.*) Despite the severity of her disease, Callison successfully recovered from the replacement of her right hip.

By the time Callison ended work in 1994, the doctor's earlier prediction of future problems had apparently come true. According to an examination of Callison by Dr. Larry Birch, a board certified internal medicine specialist, Callison suffered "[m]echanical hip pain and muscle dearrangment due to prosthesis on the right side [and][p]re-existing degenerative joint disease in both knees." (*Id.* at 193.) Birch, who described Callison as a "very pleasant lady," noted that Callison had difficulty off the examining table, she favored her right hip and had an obvious

right leg limp, and that her "squatting is very poor." (*Id.* at 192.) The government apparently engaged Dr. Birch to do a "consultative examination" of Callison. *Compare* Tr. 149 (describing Birch's examination as a "CE" type examination) with Tr. 192–93 (Birch's report describing Callison as the "Claimant.")

W.C. Barr, M.D., a treating physician, who saw Callison a number of times in 1994 and 1995, confirmed that Callison's knees showed "deformation" (*id.* at 214) and at times her extremities showed an edema. (*Id.* at 199.) Callison had complained to him of left hip, knee and ankle pain. Although an x-ray of her left hip was normal, this treating physician agreed with Dr. Birch's assessment that Callison had "DJD" or degenerative joint disease. (*Id.* at 214.) He prescribed medications as result. (*Id.*)

Another doctor, engaged by the government, reviewed the medical records, including the reports of Dr. Birch, Dr. Burr and certain x-rays. Because of the successful hip replacement surgery in 1988, a normal x-ray of the left lip, and the fact that x-rays revealed that the "right knee and left knee both showed [only] mild osteoarthritis with slight narrowing of the medial compartment and marginal spurring," the doctor believed that Callison did not meet or equal any listing of impairments and she could perform light work. (*Id.* at 149.)

Callison stated, and the records support her testimony, that she was taking medication for the joint disease. (*Id.* at 119.) For example, she was prescribed and was at one point taking two 500 mg. tablets of "Naproxen" daily. (*Id.*) In addition, she testified that she was taking 600 mg. of prescription Lodine daily plus "at least five Tylenol [tablets] a day." (*Id.* at 26–27.) This medicine upset her stomach, and she had to take other medications to relieve the stomach upset. (*Id.* at 50.) The medicine only "took the edge off" the pain. (*Id.* at 45.)

Callison described performing only light house work. She had difficulty squatting and kneeling because of the pain and this made it difficult to clean. She had difficulty climbing stairs. Her son cleared the snow and mowed the lawn.

Callison lived with her aged mother, who was ambulatory. The claimant was able to prepare meals and wash clothes and the like. Callison was able to drive a car, and the two women would visit friends about once a month. Callison testified that she read a lot, and tried to crochet and do embroidery.

A vocational expert testified at the request of the ALJ. The ALJ asked the expert to "assume [Callison's] testimony here today is true and accurate, what would be your opinion?" (*Id.* at 73.) The expert responded, "I don't feel that she would be able to perform any substantial gainful activity." (*Id.*)

Furthermore, the ALJ also asked the expert "with those limitations in September [19]94, were there jobs the claimant could perform which existed in her region or the several regions of the country?" (*Id.* at 70.) The expert did not understand what "those limitations" were. (*Id.*) The ALJ told the expert to review exhibit 8. (*Id.*) Exhibit 8 was Callison's report of disability. The expert was unfamiliar with the report, and had to review it before answering the judge's question. (*Id.*)

After a brief review, the expert, basing her opinion on the "scanned information," concluded that Callison could not do light work, but could do sedentary work "assuming that she could sit most of the eight hours." (*Id.*) The expert added that there were 776 jobs in Nebraska for nurses that involved sedentary work. (*Id.*)

The expert also stated that if Callison could do "light" work by controlling her ankle pain and swelling, there were 4,765 "light" nursing jobs available in Nebraska. (*Id.* at 71.) The expert made this statement after the ALJ asked her to make an assumption that Callison could control the ankle problems through use of "elastic stockings" or the like. (*Id.* at 71–72.) The ALJ did not state where he derived from the record support for the assumption that Callison could control the ankle problems.

## B.

The ALJ followed the five-step sequential analysis required by the law. He ultimately concluded that Callison was not "disabled." Specifically, the ALJ found:

(1) Since September 28, 1994, the Claimant had not performed substantial and gainful work.

(2) The record established severe impairments, namely, the Claimant's status post right hip replacement and osteoarthritic changes in the knees.

(3) While the Claimant did not have a "listed" impairment, her impairments were significant because she could not perform any work requiring lifting more than 25 pounds, excessive walking, repeated bending, stooping, climbing, kneeling or crawling.

(4) Due to such limitations, the Claimant had been unable to return to her past relevant work as a nurse.

(5) Discounting the Claimant's', subjective complaints because she was not credible, the Claimant had the "residual functional capacity" to do "light" work and "light" jobs existed in significant numbers for which the Claimant was qualified.

(*Id.* at 21.)

Callison appealed the decision of the ALJ. The Appeals Council affirmed the decision of the ALJ. (*Id.* at 5–6.)

## II.

Callison makes two arguments. First, she argues that the ALJ erred by discounting her subjective complaints without properly discussing the factors set out in *Polaski v. Heckler*, 739 F.2d 1320, 1321–22 (8th Cir. 1984). Second, she argues that the ALJ's hypothetical questions to the vocational expert were vague and failed to state with precision the claimant's impairments that the ALJ accepted as supported by the record as a whole.

I agree with both the arguments advanced by Callison. Each point is sufficient to require reversal. Accordingly, I will remand this case for further consideration by the ALJ.

## A.

In making this determination, I have applied well-known principles governing the standard of review. There are three principles that govern my review.

■ First, my task is to decide whether there is "substantial evidence" to support the decision of the ALJ, and "substantial evidence" (a) means more than a "mere scintilla"; (b) equals the amount of evidence that a reasonable mind might accept as adequate in support of a conclusion; and (c) is determined by reviewing the whole record. *See, e.g., Johnson v. Chater,* 87 F.3d 1015, 1017 (8th Cir.1996); *Dobson v. Chater,* 927 F.Supp. 1265, 1269–70 (D.Neb.1996) (citing *Trew v. Shalala,* 861 F.Supp. 860, 866 (D.Neb.1994) (citations omitted)).

■ Second, it is not my job to decide the facts anew, reweigh the evidence, or substitute my judgment for that of the Commissioner. *Brockman v. Sullivan,* 987 F.2d 1344, 1346 (8th Cir.1993). In this regard, I "must consider both evidence neatly supports and evidence that detracts from the Secretary's decision, but may not reverse merely because substantial evidence exists for the opposite decision." *Johnson v. Chater,* 87 F.3d at 1017 (citing *Woolf v. Shalala,* 3 F.3d 1210, 1213 (8th Cir.1993)).

■ Third, before the claimant's subjective complaints can be discounted, the ALJ must make express credibility determinations and set forth inconsistencies in the record that lead the ALJ to reject the complaints. *Polaski,* 739 F.2d at 1321–22. To accomplish this task the ALJ must explicitly apply and discuss the factors set out in *Polaski. Cline v. Sullivan,* 939 F.2d 560, 565 (8th Cir.1991); *Sorich v. Shalala,* 838 F.Supp. 1354, 1361 (D.Neb.1993).

## B.

■ In *Polaski* the United States Court of Appeals for the Eighth Circuit held that the absence of objective medical evidence alone does not permit an ALJ to discount a claimed impairment resting in whole or in part upon subjective complaints. *Polaski,* 739 F.2d at 1322. The ALJ must consider all the evidence, including work history, observations by third parties, and observations by treating and examining physicians, relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; (5) functional limitations. *Id.*

■ Furthermore, "[i]t is not enough that inconsistencies may be said to exist, the ALJ must set forth the inconsistencies in the evidence presented and discuss the factors set forth in *Polaski* when making credibility determinations." *Cline,* 939 F.2d at 565 (where a claimant had her right hip replaced and suffered pain in connective tissues, the court reversed the ALJ's decision denying the ALJ was among the *Polaski* factors, and because the decision "inadequately explains the inconsistencies relied upon in disbelieving appellant's allegations of pain and does not reveal that appellant's credibility was evaluated according to factors set forth in *Polaski*"); *Sorich,* 838 F.Supp. at 1361 (when "the *Polaski* case is cited but the factors are not seriously discussed in relationship to inconsistencies found by the ALJ, it is impossible for a reviewing court ... to properly do its job" and the case must be reversed). In other words, the ALJ must *explain,* in relation to the *Polaski* factors, why the evidence detracts from the claimant's credibility.

■ I agree with Callison that ALJ did not adequately explain his reasons for discounting her credibility regarding the subjective complaints. I come to this conclusion because (1) the ALJ ignored some *Polaski* factors; (2) the ALJ discussed a *Polaski* factor but did not explain why some of the related evidence detracted from the claimant's credibility; (3) when discussing a *Polaski* factor the ALJ discounted relevant evidence favoring the claimant's credibility without explanation. While I could give more, three examples will illustrate what I mean.

Initially, the ALJ did not explicitly discuss the evidence in relationship to the *Polaski* factor relating to the duration, frequency, and intensity of the pain or the factor relating to the precipitating and aggravating

causes of the claimed pain. Moreover, the ALJ did not discuss the evidence in relationship to the functional limitation factor. Still further, there is no discussion about the evidence and the *Polaski* factor relating to dosage, effectiveness, and side effects of medication.

While the ALJ makes stray references to evidence which *might* relate to some or all of these factors, he does not provide an analysis. Consequently, one cannot judge the logic of the ALJ's reasoning as it relates to these factors and the evidence. For example, it does no good to state that the claimant takes medications (Tr. 15) without explaining how or why that evidence supports or detracts from the claimant's credibility (Tr. 15–19).

Next, the ALJ's credibility discussion is largely built upon quotations from the medical records about Callison's successful surgery for replacement of her right hip (Tr. 16–18) without analysis of the relevance of that evidence. The lack of analysis is significant.

Callison never claimed that the surgery was unsuccessful and thus the relevance of the evidence is not apparent. Indeed, Callison worked for six years after the surgery. A nurse, who scheduled her hip replacement surgery during a vacation, and then continued to work for six years after that serious and painful procedure was completed, does not appear to be a person who is likely to subsequently exaggerate her symptoms.

In contrast to a claim of disability due to a poor surgical result in 1988, Callison claimed that she suffered from disabling degenerative joint disease in the legs and related pain in 1994. Specifically, Callison claimed than the degenerative joint disease had not only caused the right hip replacement in 1988, but that it had progressed and caused her to suffer, in 1994, disabling pain in all of the joints of her legs.

Without some logical explanation, quotations from medical records about a successful surgery before the onset of the alleged disability are irrelevant to the issue of credibility. In short, the ALJ may not set up a "straw man," knock it down, and then be judged to have appropriately discussed the claimant's credibility.

Still further, the ALJ described, but did not analyze, the 1995 medical reports regarding the examinations of Dr. Birch and Dr. Burr. (Tr. 18.) Rather, the ALJ, referring to this and other medical evidence, summarily state, that the "documentary evidence of record reveals an individual who, although undoubtedly has experienced discomfort, appears to have exaggerated her symptoms and not given a full effort to attempt to gauge her functional limitations." (*Id.* at 19.) However, nowhere do Dr. Birch and Dr. Burr remotely suggest that the claimant "appears to have exaggerated her symptoms" or failed to give "a full effort to gauge her functional limitations."

On the contrary, Dr. Birch described Callison as "a very pleasant lady" who, by history, suffered from "severe degenerative joint disease." (Tr. 192.) The doctor further gave Callison a 1995 diagnosis of "[m]echanical hip pain and muscle dearrangement due to prosthesis on the right side" and "[p]re-existing degenerative joint disease in both knees." (*Id.* at 193.) Likewise, Dr. Burr diagnosed Callison in 1995 as suffering from degenerative joint disease. (*Id.* at 214.)

On the face of them, the reports do not support the ALJ's claim that Callison "appears to have exaggerated her symptoms and not given a full effort to attempt to gauge her functional limitations." (*Id.* at 19.) On the contrary, these reports appear to bolster Callison's credibility. The ALJ apparently discounted these reports, but he gave no understandable explanation why he did so.

In summary, it is a tedious task to evaluate credibility. Nevertheless, unless an ALJ explains his views on credibility, in relation to each *Polaski* factor, with sufficient detail that a reviewing court can understand the logic of the ultimate credibility conclusion, there is nothing to review. Where an ALJ fails to give such an explanation, the error requires reversal. *Cline*, 939 F.2d at 565.

## C.

Callison's second argument is also valid. The ALJ's hypothetical questions to the vocational expert were vague and failed to state with precision the claimant's impairments that the ALJ accepted as being supported by the record as a whole.

The initial "hypothetical question" was so vague that the vocational expert indicated at first that she did not understand it. Then the judge simply referred her to an exhibit, the claimant's report of disability. The judge did not tell the expert what part of the report he was considering as true or what part she should use. After "scanning" the report, the expert stated that the claimant could not do light work but could do sedentary work assuming that she could sit for eight hours. Subsequently, the ALJ, without reference to support for the assumption, asked the expert to assume that the claimant could control her ankle problems. Making that assumption, the expert stated that there were light jobs available to the claimant.

The hypothetical questions also omitted any reference to the findings of Dr. Birch or Dr. Burr which, facially at least, tended to support the claimant's testimony. The questions also omitted any reference to the x-rays which showed osteoarthritis in the knees. The questions also omitted any reference to Callison's testimony. It is therefore unclear whether the judge discounted some or all of this evidence or whether he simply forgot to include that information in the hypothetical questions. It is equally unclear what the vocational expert was basing her opinions upon. Given the ALJ's finding that Callison could not return to her previous employment, the burden shifted to the government to prove that a substantial number of jobs existed in the national economy for which the claimant was suited despite her disability. *Cline*, 939 F.2d at 564. Where the vocational expert responds to a correctly formulated hypothetical, the expert's response that a claimant is capable of performing jobs that existed in the national economy in significant numbers constitutes substantial evidence that supports an ALJ's "no disability" ruling. *Cruze v. Chater*, 85 F.3d 1320, 1323, 1326 (8th Cir.1996).

However, a hypothetical question than is vague does not produce substantial evidence. *McGhee v. Harris*, 683 F.2d 256, 259 (8th Cir.1982) ("The record in this case clearly demonstrates the danger of using a vague generalized question....") Likewise, a hypothetical question which fails to "relate with precision all of a claimant's impairments" that the ALJ accepts as being supported by the record as a whole does not produce substantial evidence. *Ekeland v. Bowen*, 899 F.2d 719, 722 (8th Cir.1990).

Here, the questions presented to the expert were vague and failed to state with precision the claimant's impairments that the ALJ accepted as being supported by the record as a whole. Therefore, reversal is required.

## III

In this case, where I cannot state with certainty that benefits must be awarded under any conceivable circumstance, remand, rather than, a judgment awarding benefits, is the appropriate remedy. *Cf. Trew*, 861 F.Supp. at 870.

Accordingly,

IT IS ORDERED that judgment will be entered by separate document providing that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision appealed from is reversed, this case is remanded for reconsideration in accordance with this opinion, and claimant's attorney shall promptly file his application, affidavits and supporting brief respecting any claim for attorney fees.