**Patricia Amato v. Apfel**        **CV-98-010-PB   03/22/99**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE


<u>**PATRICIA A. AMATO**</u>

     v.                             Civil No. 98-010-B

<u>**KENNETH S. APFEL**</u>, <u>**Commissioner**</u>,
<u>**Social Security Administration**</u>


## <u>MEMORANDUM AND ORDER</u>

Patricia Amato suffers from back spasms and chronic pain in her back, neck, chest and hip stemming from a work-related accident in February 1992 where she was pushed into a conveyer by a forklift.  She continued working after the accident, but aggravated the injury in the summer of 1993, was put on light duty, and was eventually terminated by her employer.  She has not engaged in substantial gainful activity, as defined by the Social Security Administration ("SSA") regulations, since January 10, 1994.

Amato applied for Supplemental Security Income ("SSI") benefits on October 20, 1995.  After the SSA denied her application, Amato requested a hearing before an Administrative Law Judge ("ALJ").  ALJ Ruth Kleinfeld held a hearing on Amato's claim on July 2, 1996, and denied Amato's claim on September 27, 1996.  The Appeals Council denied plaintiff's request for review

on December 4, 1997, making the ALJ's decision the "final" decision of the Commissioner and opening the door to judicial review.

Amato brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act (the "Act"), seeking review of the SSA's decision denying her claim for benefits. For the following reasons, I vacate the ALJ's decision.

## I.   FACTS[1]

At the time of her hearing, Amato was 40 years old. See Tr. at 43. She has a ninth-grade education. See id. at 44. Prior to her alleged disability, Amato held jobs as a meat cutter, a housekeeper/maid in a hotel, a milker in a dairy, and a machine operator. Amato has not worked since her discharge from the Jac Pac meat cutting plant on January 10, 1994.

Amato's troubles began in February 1992, when she was pushed into a conveyor by a forklift. She did not report the incident or her resulting injuries to her employer, however, because she was told that she would be fired if she did. See id. at 46. She aggravated the injury in the summer of 1993 while pushing buckets

---

[1] Unless otherwise noted, the following facts are culled from the "Joint Statement of Material Facts" submitted by the parties.

of meat down a conveyor belt.  After a subsequent unsuccessful attempt to return to her job as a meat cutter, Amato sought out and accepted a less strenuous position within the company.  On the day of her discharge, Amato was working in an office at the plant printing labels from a computer, a job which she stated she didn't have a problem doing because she was allowed to take breaks when necessary.  See id. at 60.  Her employer moved her to this light duty position from the meat trimming line in late 1993.  According to Amato, there were no complaints about the volume of work she was producing, but she was terminated because her employer "wanted [her] back on the production floor . . . doing what [she] was hired for (trimming meat)."  Id. at 60.

In July 1992, several months after the initial forklift accident, Amato was examined by Dr. Belinda Castor, M.D., for pain and discomfort in her left hip and back.  She was treated for paraspinal tenderness and prescribed the anti-inflammatory drug Ansaid.  See id. at 121-22.  During the next two years, plaintiff sought treatment from Dr. Castor for a variety of transient or resolving conditions, including a mild umbilical hernia, a chronic musculoskeletal strain, and diffuse back and neck pain.  See id. at 121-131.

From July to September 1993, after reinjuring her lower back while pushing a heavy bucket of meat along a conveyer, Amato was

treated at the Elliot Hospital for chronic neck and back pain. She also consulted a chiropractor, Robbin Bruck, during this period. Dr. Bruck diagnosed scoliosis with cervical neuritis, and placed Amato on total disability from September 12, 1993, to October 11, 1993, to stabilize her spine and allow her back injury to heal. Bruck expected Amato to eventually return to full-time restricted light duty work.

Dr. David Lewis, an osteopath, examined Amato on October 19, 1993, diagnosing chronic lumbar, cervical and thoracic strain with probable facet syndrome, but found no evidence of neurological deficit or radiculopathy. He prescribed Voltaren and Flexeril and a course of physical therapy, but noted that she should continue working on her present work schedule. According to Dr. Lewis, Amato's pain would be chronic, and the purpose of treatment would be to improve flexibility, strength and function.

Dr. Richard Hockman, an orthopedic surgeon, treated Amato from November 1993 until January 1994. Dr. Hockman found no objective change in Amato consistent with the degree of pain she was experiencing. In January 1994, Dr. Hockman reported that an X-ray of Amato's lumbosacral spine revealed a small scoliosis, minimal degenerative changes and an extra lordosis in Amato's lumbar spine, but noted that surgery was not required. He discharged Amato back into Dr. Castor's care.

Dr. William Kilgus treated Amato for chronic pain in her upper lumbar and lower thoracic spine from March 1994 to May 1996. His clinical examination revealed that Amato had a good range of motion in the cervical, thoracic and lumbosacral spine, with mild pain and spasm on extremes of motion. Dr. Kilgus found no neurological damage, and referred Amato to physical therapy. His notes indicate that Amato was doing fairly well, but experienced aggravated symptoms during periods of physical stress or extreme bad weather. He concluded that Amato suffered from a chronic thoracolumbar strain, and required no other treatment.

In April 1994, Amato experienced a recurrence of pain in her back and neck. Clinical examination revealed a limited range of motion in the cervical and thoracolumbar spine, with pain and spasm on motion. Dr. Kilgus referred Amato to Dr. Keith Zimmerman, a chiropractor, for further treatments.

Dr. Zimmerman's initial examination revealed decreased cervical lordosis, decreased cervical range of motion, decreased thoracolumbar range of motion, pain, tenderness and spasm. Amato complained that lifting, bending, and sitting aggravated her condition. By August 1994, Dr. Zimmerman reported that Amato was responding to therapy and had good range of motion in the upper thoracic and lower cervical spine, but still experienced mild pain and spasms.

In September 1994, Dr. Kilgus prescribed Soma-compound, a narcotic pain medication, to help Amato with her chronic and persistent pain, but the pain continued in November and December 1994. Dr. Kilgus reported that Amato's December clinical examination demonstrated pain radiating away from the thoracic spine into the paravertebral musculature, limited range of motion, and spasm. An MRI, conducted at Dr. Kilgus' request on December 16, 1994, was unremarkable.

At the request of the Social Security Administration, Amato was evaluated by Dr. Diana Collins, a psychologist, on November 30, 1995. Dr. Collins found Amato's mental status unremarkable. According to Dr. Collins, Amato's ability to relate to peers and co-workers, and ability to handle funds was acceptable. Amato gave no indication that emotional issues played any part in her inability to return to work.

Drs. Robert Rainie, Burton Nault, Udo Rauter, and an individual whose name is illegible, see Tr. at 79, all non-examining state agency medical and psychiatric consultants, evaluated Amato's exertional and non-exertional impairments in November and December 1995. After assessing the record, Dr. Rainie concluded that Amato had a "good RFC" - including the capacity to occasionally lift and carry up to 20 pounds, to frequently lift and carry up to 10 pounds, to stand, walk or sit

upright for six hours per day with normal breaks, and an unlimited capacity to push and pull. Although Dr. Rainie found that Amato had occasional postural limitations in all of the areas assessed, he found that she had no visual, communicative, or environmental limitations. Dr. Nault reviewed the record and affirmed Dr. Rainie's conclusions.

On December 5, 1995, a psychiatrist assessed Amato's non-exertional impairment and found no medically determinably psychiatric impairment. Dr. Rauter reviewed the record and affirmed the psychiatrist's evaluation.

On May 2, 1996, Dr. Kilgus completed a Medical Assessment of Ability to do Work-Related Activities (Physical) form for Amato. In that assessment, Dr. Kilgus found Amato able to lift 10-15 pounds. He also noted that her condition did not implicate her ability to stand, walk, or sit, and that she could perform all postural activities listed with no restriction on the physical functions assessed. Dr. Kilgus' only assessed restriction related to vibration, which he reported could affect Amato's activity due to the weakness in her lower back.

More than a year later, however, on June 23, 1997, Dr. Kilgus completed a Lumbar Spine Residual Functional Capacity Questionnaire for Amato. In that report, Dr. Kilgus stated that Amato suffered from chronic thoracic lumbar strain characterized

by pain and spasm. He observed a significantly reduced range of motion, tenderness, swelling, spasm, muscle weakness, weight change, and sleep impairment. Dr. Kilgus reported that Amato's pain would often interfere with her ability to maintain attention and concentration. He concluded that Amato could continuously sit or stand for only 45 minutes at a time, and could perform these activities for less than 2 hours in an 8-hour day. Dr. Kilgus reported that Amato had to change positions at will from sitting to standing to walking, and required two unscheduled 15 minute breaks in an 8-hour workday. She could not do any bending or twisting at the waist. Dr. Kilgus noted, however, that Amato could still lift 10 pounds frequently and 20 pounds occasionally.

Amato appeared *pro se* and testified at the hearing before ALJ Kleinfeld on July 2, 1996. Despite repeated offers by the ALJ, Amato refused the assistance of counsel. At the hearing, vocational expert Christopher Wood testified that Amato's past work as a meat cutter constituted heavy skilled labor; her past position as a hotel maid was unskilled light work; her job as a milker in a dairy was unskilled medium exertion employment; and finally, her position as a machine operator constituted semi-skilled medium exertion employment.

During the hearing, the ALJ asked Wood a series of hypothetical questions. In response to the ALJ's first

-8-

hypothetical question, Wood concluded that an individual with Amato's vocational profile who was restricted to sedentary and light work, able to lift no more than 10-15 pounds and further limited to no repetitive bending, twisting, or vibration would still be able to do work readily available in the national economy. Examples of such positions would include cashiering, with 15,000 positions in New Hampshire and 3 million nationwide; video rental counter staffing, with 1,128 positions in New Hampshire and 341,000 nationally; fast food service, with 3,547 positions in New Hampshire and 1.6 million nationwide; and amusement and recreation attendant jobs, with 1,384 slots in New Hampshire and 267,000 across the country.

In response to a follow-up hypothetical that assumed that this individual also had to avoid prolonged standing, Wood noted that none of the jobs just discussed would remain appropriate. Wood likewise concluded that if this hypothetical individual had the need to shift positions every 20-30 minutes, this would also disqualify the jobs just identified. He noted, however, that this individual could still do work in the national economy. Among these jobs, Wood noted, are service station cashiering jobs which allow a sit/stand option, of which there are 663 positions in New Hampshire and 3 million nationally; parking lot attendant positions, of which there 97 in New Hampshire and 64,000 in the

-9-

national economy; and transportation ticket agent positions which allow a sit/stand option, of which there are 465 in New Hampshire and 139,000 nationally.

On September 27, 1996, ALJ Kleinfeld found Amato not disabled and consequently ineligible for supplemental security income under sections 1602 and 1614(a)(3)(A) of the Act. Amato appealed the ALJ's adverse ruling to the Appeals Council on November 13, 1996. While the Appeals Council was considering her case, Amato submitted new evidence in support of her appeal, including, most significantly, the Lumbar-Spine Residual Functional Capacity Questionnaire completed by Dr. Kilgus on June 23, 1997, nearly a year after Amato's hearing before the ALJ.

The Social Security Administration regulations provide that the Appeals Council must grant a request for review where: (1) there appears to be an abuse of discretion by the Administrative Law Judge; (2) the Administrative Law Judge made an error of law; (3) the Administrative Law Judge's action, findings, or conclusions are not supported by substantial evidence; or (4) the case concerns a broad policy or procedural issue which may affect the public interest. The regulations also provide that where new and material evidence is submitted with a request for review, the entire record will be evaluated and review will be granted where the Appeals Council finds that the Administrative Law Judge's

actions, findings, or conclusion is contrary to the weight of the evidence currently of record. See 20 C.F.R. 416.1470. On September 5, 1997, the Appeals Council denied Amato's request for review, rendering the ALJ's decision the "final" decision of the Commissioner.

## II. <u>STANDARD OF REVIEW</u>

After a final determination by the Commissioner denying a claimant's application for benefits, and upon a timely request by the claimant, I am authorized to: (1) review the pleadings submitted by the parties and the transcript of the administrative record; and (2) enter a judgment affirming, modifying, or reversing the ALJ's decision. See 42 U.S.C.A. § 405(g). My review is limited in scope, however, as the ALJ's factual findings are conclusive if they are supported by substantial evidence. See <u>Irlanda Ortiz v. Secretary of Health and Human Servs.</u>, 955 F.2d 765, 769 (1st Cir. 1991); 42 U.S.C.A. § 405(g). The ALJ is responsible for settling credibility issues, drawing inferences from the record evidence, and resolving conflicting evidence. See <u>Irlanda Ortiz</u>, 955 F.2d at 769. Therefore, I must "'uphold the [ALJ's] findings . . . if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the ALJ's] conclusion.'" <u>Id.</u> (quoting

-11-

<u>Rodriguez v. Secretary of Health and Human Servs.</u>, 647 F.2d 218, 222 (1st Cir. 1981)).

If the ALJ has misapplied the law or has failed to provide a fair hearing, however, deference to the ALJ's decision is not appropriate, and remand for further development of the record may be necessary. <u>See</u> <u>Carroll v. Secretary of Health and Human Servs.</u>, 705 F.2d 638, 644 (2d Cir. 1983); <u>see also Slessinger v. Secretary of Health and Human Servs.</u>, 835 F.2d 937, 939 (1st Cir. 1987)("The [ALJ's] conclusions of law are reviewable by this court.")  I apply these standards in reviewing the issues Amato raises on appeal.

## III.  <u>DISCUSSION</u>

To establish entitlement to benefits under Title XVI of the Act, a plaintiff has the burden to establish that she is disabled within the meaning of the Act. <u>See</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137, 146 (1987); <u>Deblois v. Secretary of Health and Human Servs.</u>, 686 F.2d 76, 79 (1st Cir. 1982).  To be considered "disabled," a plaintiff must not only prove that she is unable to return to her past work, but also that she is unable to perform any substantial gainful work in the national economy as the result of a medical condition which can be expected to last for a continuous period of 12 months or more.  <u>See</u> 42 U.S.C. §§ 416(i)(1), 423(d)(1).

This determination must consider the plaintiff's age, education, training and work experience - the mere existence of a medical impairment is not enough. See 42 U.S.C. § 423(d)(2)(A). The impairment must be so severe, in combination with her vocational factors, to preclude any type of gainful activity. See McDonald v. Secretary of Health and Human Servs., 795 F.2d 1118, 1129 (1st Cir. 1986); Thomas v. Secretary of Health and Human Servs., 659 F.2d 8, 9 (1st Cir. 1981). If a plaintiff is partially but not totally disabled by her impairments, she is not disabled within the meaning of the Act. See Rodriguez v. Celebrezze, 349 F.2d 494, 496 (1st Cir. 1965).

In evaluating a claim for disability benefits, the ALJ's analysis is governed by a five-step sequential evaluation process.[2] See 20 C.F.R. § 404.1520 (1998). In the case at bar, the ALJ concluded that Amato was "not disabled" at step five of the sequential evaluation process because she retained the ability to perform light work. At step five, the Commissioner has the burden to show that, despite the severity of the

_____

[2] In applying this five-step sequential analysis, the Secretary is required to determine: (1) whether the claimant is presently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals a listed impairment; (4) whether the impairment prevents the claimant from performing past relevant work; (5) whether the impairment prevents the claimant from doing any other work. See 20 C.F.R. § 404.1520 (1998).

-13-

claimant's impairments and inability to return to past relevant work, she retains the residual functional capacity ("RFC") to do alternative work in one or more occupations that exist in significant numbers in the region where the claimant lives, or in the national economy. See Heggarty v. Sullivan, 947 F.2d 990, 995 (1st Cir. 1991). The Commissioner must show that the claimant's limitations do not prevent her from engaging in substantial gainful work, but need not show that the claimant could actually find a job. See Keating v. Secretary of Health & Human Servs., 848 F.2d 271, 276 (1st Cir. 1988)("[t]he standard is not employability, but capacity to do the job"). Amato alleges that the Commissioner (1) improperly evaluated Amato's subjective pain complaints, and (2) failed to properly weigh the opinions of Amato's treating physician. I address each of these arguments in turn.

## A. The Commissioner failed to properly evaluate plaintiff's subjective pain complaints

Subjective pain complaints are properly evaluated after considering the totality of the evidence. See 42 U.S.C.A. § 423(d)(5)(A)(Supp. 1997); 20 C.F.R. § 404.1529(C)(4)(1998); Avery v. Secretary of Health & Human Servs., 797 F.2d 19, 23 (1st Cir. 1986). In determining the weight to be given to allegations of

-14-

pain, "complaints of pain need not be precisely corroborated by objective findings, but they must be consistent with medical findings." Dupuis v. Secretary of Health and Human Servs., 869 F.2d 622, 623 (1st Cir. 1989). Where objective evidence does not substantiate the degree of limitation due to pain and a further review of the medical evidence fails to show any objective findings typically associated with the limiting pain alleged, the inquiry into pain is not terminated. See Avery, 797 F.2d at 23. In such cases, the ALJ:

> must be aware that symptoms, such as pain, can result in greater severity of impairment than may be clearly demonstrated by the objective physical manifestations of a disorder. Thus, before a complete evaluation of this individual's RFC can be made, a full description of the individual's prior work record, daily activities and any additional statements from the claimant, his or her treating physician or third-party relative to the alleged pain must be considered. Only then is it possible to fully assess whether the pain is reasonably consistent with the objective medical findings and to determine RFC.

Avery, 797 F.2d at 23. Specifically, the ALJ must consider: (1) the claimant's daily activities; (2) the location, onset, duration, frequency, radiation, and intensity of pain and other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and adverse side-effects of any pain medications; (5) any non-medication forms of treatment for pain relief employed by the claimant; (6) any functional restrictions;

-15-

and (7) any other relevant factors.  See 20 C.F.R. §§ 404.1529(c)(3)(1998), 416.929(c)(3)(1998); see also Avery, 797 F.2d at 29.

If the ALJ has properly addressed all relevant evidence of claimant's pain, including both objective medical findings and detailed descriptions of the effect of pain on claimant's daily activities, "[t]he credibility determination by the ALJ who observed the claimant, evaluated [her] demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference, especially when supported by specific findings." Frustaglia v. Secretary of Health & Human Servs., 666 F.2d 662, 665 (1st Cir. 1981).  The ALJ, however, may not simply "set up a straw man, knock it down, and then be judged to have appropriately discussed the claimant's credibility." Callison v. Callahan, 985 F. Supp. 1182, 1187 (D.Neb. 1997).  Unless an ALJ explains her views on credibility in relation to each of the aforementioned factors "with sufficient detail that a reviewing court can understand the logic of the ultimate credibility conclusion," there can be no meaningful review, and reversal is required.  Id. (citing Cline v. Sullivan, 939 F.2d 560, 565 (8th Cir. 1991)).

In this case, the ALJ acknowledged the relevant criteria in her written decision, but did not properly apply these criteria

to Amato's case in a manner sufficient to subject her logic to meaningful review.  The ALJ's entire treatment of Amato's subjective pain complaint appears below:

> When examined in the light of the criteria set forth above, I find that the claimant's allegations of disabling symptoms are not entirely credible. The claimant's chronic thoracolumbar pain may cause some limitation to her functioning, but not to a greater extent than has already been accounted for in the residual functional capacity assessed above.  Ms. Amato's activities of daily living do not reflect totally disabling symptoms.  She is able to do all but major household chores, and is limited in her ability to perform daily living activities in which lifting and carrying more than 10 pounds is involved (Exhibit 9).  The claimant's chronic pain does impose limitations upon her ability to perform work, but not to an extent that would further limit her functional capacity.  I find that the claimant does not credibly experience pain at a level that would further limit her functional capacity. . . .

Tr. at 25.  As evidenced by the passage above, the ALJ made only an insufficient conclusory remark about Amato's daily activities, and a vague and passing allusion to Amato's pain symptoms and functional restrictions.  None of the other <u>Avery</u> factors are even addressed in the ALJ's decision despite a record replete with relevant facts.  I highlight these facts below.

### 1.  Amato's daily activities

The ability to engage in "substantial gainful activity" means the ability to work, day in and day out, in the conditions in which real people work in a real world. See <u>Allred v. Heckler</u>, 729 F.2d 529, 533 (8th Cir. 1984).  It requires the

-17-

ability to do sustained work-related physical and/or mental activity in a work setting on a regular and continuing basis for 8 hours a day, 5 days a week. See Social Security Ruling 96-8p. A disability claimant need not show that she is completely incapacitated before she can qualify for benefits. See Baumgarten v. Chater, 75 F.3d 366, 369 (8th Cir. 1996)(claimant "need not prove her pain precludes all productive activity and confines her to a life in front of the television"); Hatfield v. Apfel, 1998 WL 160995 (D. Kan.)("claimant's ability to engage in limited daily activities is not inconsistent with the inability to perform substantial gainful activity").

Amato states that her pain wakes her an average of six to seven times a night, that she cannot sit or stand for prolonged periods of time, that she cannot twist from side to side or bend over, and that she can no longer lift anything heavier than 10 pounds. See Tr. at 109-111. She reports that extreme temperatures (hot or cold) and dampness worsen her pain, and often render her completely incapacitated. She is heavily dependent on her daughter to assist her with most daily life activities that she is still able to perform. For example, she grocery shops only once a month and requires the assistance of her daughter or the cab driver to carry the groceries to her apartment and put them away. See id. at 109. She reports that

her pain medicines help her to perform simple household tasks like doing dishes and the laundry, although there are some days when she is unable to complete even these basic household tasks. She has trouble with vacuuming, making her bed, and other more strenuous chores. See id. at 109. Further, Amato reports that there are some days when she "can shower and dress up" but "other days [she can't] because of pain." Id. She leaves her home "only when [she] has to" to go to the drug store, or to doctor's or welfare appointments, and typically either walks, rides the bus, or takes a cab, depending on how she feels. Id. The record indicates that other than watching television and listening to the radio, she engages in no other hobbies or social activities.

### 2. Location, onset, duration, frequency, and intensity of pain

Amato reports that she wakes six to seven times a night from the pain, and "cannot roll over without waking up." Id. at 109. She reports that she suffers from pain "every day," and that there are some days that she "just can't do anything," including attending to her sanitary needs, because of the pain and her inability to turn. See id. at 49. Typically, the pain radiates from her lower back down into her groin area and then into her leg. See id. at 49-50. She also experiences headache and neck pain, and frequently experiences fatigue, exhaustion, and

numbness in her legs when trying to work through her backaches. See id. at 110-11.

### 3. Precipitating and aggravating factors

Amato notes that temperature extremes (heat or cold) and dampness tends to exacerbate her pain. See id. at 49, 109, 111. Rolling over during sleep triggers pain sufficient to wake her. See id. at 52. Sitting or standing for long periods of time, twisting or bending, attempting to lift heavy objects, and attempting to "straighten out" also trigger her symptoms. See id. at 49-50, 52, 110-11.

### 4. Medications

Doctors have prescribed Ansaid,[3] Voltaren,[4] Flexeril, Soma,[5] Darvocet,[6] and Vicodin[7] to treat Amato's symptoms. At the

---

[3] Ansaid is an anti-inflammatory drug. See Tr. at 121.

[4] Voltaren is a nonsteroidal anti-inflammatory drug prescribed to relieve pain related to inflammation. See Physicians' Desk Reference, 52nd Ed. (1998) at 1830.

[5] Soma, a narcotic pain medication, is prescribed for the relief of pain, muscle spasm, and limited mobility associated with acute, painful, musculoskeletal conditions. See Physicians' Desk Reference, 47th Ed. (1993) at 2504.

[6] Darvocet is prescribed for the relief of mild to moderate pain. See Physicians' Desk Reference, 47th Ed. (1993) at 1288.

[7] Vicodin is indicated for the relief of moderate to moderately severe pain. See Physicians' Desk Reference, 47th Ed. (1993) at 1214.

time of her hearing, she was taking Soma (two to three times daily) and Darvocet (two to four times daily) in excess of the dosages prescribed. She testified that the Darvocet "doesn't really help a whole lot." See id. at 51. See 20 C.F.R. §§ 404.1529(c)(3)(iv)(1998); 416.929(c)(3)(iv)(1998) (in making credibility determination, the ALJ should consider the "type, dosage, effectiveness, and side effects of any medication" claimant has taken).

### 5. Non-medication treatment for pain

Amato has sought chiropractic treatment and physical therapy to alleviate her pain - treatments which have only afforded her temporary relief. See id. at 145-60, 194-205, 206-21. She has been told that she is not a candidate for surgical intervention. See id. at 166. See 20 C.F.R. §§ 404.1529(c)(3)(v)(1998); 416.929(c)(3)(v)(1998)(in making credibility determination, the ALJ should consider "[t]reatment, other than medication that the claimant has received for pain relief").

### 6. Other relevant factors

Prior to her injury, Amato worked as a meat cutter, a milker, a housekeeper, and a machine operator. Two of these jobs required Amato to work six or seven days per week. See id. at 103. At her last job as a meat cutter at Jac Pac foods, Amato was working up to 60 hours per week without complaint. See id.

at 258-59.  In fact, when she was first injured on the job at Jac-Pac in the forklift accident, Amato did not report her injury to her employer because she was concerned about getting fired if she did.  See id. at 46.  After being injured on the job a second time, Amato tried to return to her job as a meat cutter, and, when unable to resume that job, sought out and accepted less strenuous work within the company that accommodated her physical limitations.  See id. at 112.

In early 1994, however, Amato was told that she would be forced to leave the company unless her doctor lifted all of her light duty restrictions.  Amato then tried to talk her doctor into doing so, but he refused.  Instead, he lifted the restrictions on a trial basis for one week, allowing Amato to work for 6 hours per day - a condition which her employer did not accept.  Amato was then terminated, and has been unemployed ever since.  See id. at 47.

Because the ALJ failed to analyze most of the factors she was charged with applying, and fails to identify "substantial evidence" supporting her conclusion on the one factor she did consider, the ALJ's decision is vacated, and this case is remanded for further factual findings by the ALJ pursuant to sentence four of 42 U.S.C.A. § 405(g).  See DaRosa v. Secretary of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986)(remand

-22-

appropriate where ALJ's credibility determination not supported by substantial evidence because ALJ failed to consider requisite factors).

### B. Evaluation of the Opinion of Amato's Treating Physician

Because I have decided this case on other grounds, I note only in passing, that there is considerable doubt whether the Commissioner properly considered the June 23, 1997, opinion of Amato's treating physician. Because the law in this area is currently in flux,[8] and because I have already ruled that the ALJ has failed to make a proper determination about Amato's subjective pain complaints, however, I need not resolve the merits of this claim. In vacating the decision of the ALJ, however, I remand this case with instructions that, in reaching a new decision, the ALJ properly consider Dr. William J. Kilgus' June 23, 1997, report filed with the Appeals Council.[9] Such

---

[8] The circuits have split as to whether evidence submitted only to the Appeals Council, and not to the ALJ, should be considered on appeal to a district court after the Appeals Council has denied review. Cf. Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998)(holding that new evidence submitted only to the Appeals Council is not part of the administrative record for judicial review), cert. denied, 119 S.Ct. 907 (1999), with Perez v. Chater, 77 F.3d 41, 44 (2d Cir. 1996)(holding that new evidence is properly considered as part of the administrative record on judicial review).

[9] I am granted this authority by 42 U.S.C. § 405(g), which allows the court to, "at any time order additional evidence be taken before the Secretary, but only upon a showing that there is

consideration should include, if necessary, inquiring into and resolving any seemingly contradictory conclusions reached by Dr. Kilgus in his two reports.  The clerk is instructed to enter judgment accordingly.

SO ORDERED.

_____
Paul Barbadoro
Chief Judge

March 22, 1999

cc:  David Broderick, Esq.
     Raymond Kelly, Esq.

---

new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."  See also Evangelista v. Secretary, 826 F.2d 136, 139 (1st Cir. 1987).