**Mary L. BELLAMY, Plaintiff,**

v.

**Kenneth S. APFEL, Commissioner of the Social Security Administration, Defendant.**

**No. 3:98CV02214 (GLG).**

United States District Court, D. Connecticut.

Aug. 7, 2000.

---

Mary L. Bellamy, Oakdale, CT, for Plaintiff.

Ann M. Nevins, U.S. Attorney's Office, Bridgeport, CT, Deirdre Anne Martini, Ivey, Barnum & O'Mara, Greenwich, CT, for Defendant.

## DECISION ON APPEAL

GOETTEL, District Judge.

This is an action brought by plaintiff, Mary Bellamy, against the Commissioner of the Social Security Administration pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner denying her application for social security disability insurance benefits ("DIB") under section 223 of the Act, 42 U.S.C. § 423. Plaintiff, who is *pro se*, has moved for an order reversing the decision of the Commissioner, or, in the alternative, remanding this case for further administrative proceedings [**Doc. # 9**]. Defendant has moved for an order affirming the decision of the Commissioner [**Doc. # 11**]. For the reasons set forth below, the decision of the Commissioner will be affirmed.

## BACKGROUND

Plaintiff filed an application for a period of disability and for disability insurance benefits on May 31, 1995, alleging disability due to a back injury since March 14, 1992. After the State agency denied her application for DIB, plaintiff requested a hearing before a Social Security Administrative Law Judge ("ALJ"). On June 28, 1996, plaintiff, represented by counsel, testified at a hearing before ALJ Michael Marcionese. Because the ALJ found that plaintiff's case did not fall squarely within the "grids," he held a second hearing at which Vocational Expert ("VE") Ronald Freedman testified. The ALJ then issued his written decision, dated January 23, 1997. Although the ALJ found credible many of plaintiff's complaints of pain, he found that the severity of her pain and the degree of her alleged incapacity were not supported by the evidence as a whole. He further found that plaintiff retained the residual functional capacity ("RFC")[1] to perform work at the light exertional level as long as she could alternate between sitting and standing, including doing her past work as a telemarketer. (R. 31). Alternatively, he found, based upon the testimony of the VE, that even if she could not perform any of her past relevant jobs, given her RFC, her age, education, and past relevant work experience, there were a significant number of jobs in the national and local economy that plaintiff could perform. (R. 32). Accordingly, he held that

1. "Residual functional capacity" is defined by the Regulations as follows: "Your impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what you can do in a work setting. Your residual functional capacity is what you can still do despite your limitations." 20 C.F.R. § 416.945(a).

plaintiff was not under a "disability" as that term is defined by the Social Security Act.

The Appeals Council denied plaintiff's request for review, thus rendering the ALJ's decision the final decision of the Commissioner subject to judicial review. *See* 20 C.F.R. §§ 404.900(a)(4)–(5), 404.955, 404.981 (1999). Plaintiff then filed this appeal.

### A. Plaintiff's Testimony at the Hearing

Plaintiff's primary complaints at the time of the hearing before the ALJ were bulging discs in her back, numbness in her feet and upper body, including her arms and hands sometimes, and problems with her right hip that "goes out sometimes" causing her to lose her balance. (R. 64). She was taking anti-inflammatory medication for her back and high blood pressure medication. (R. 68–69, 71).

In terms of daily activities, plaintiff testified that she spends most of her day at home reading and watching television, lying in bed. She drives, but not long distances. She does some of the shopping, but her husband or children usually go with her to help. (R. 72–74). She testified that she cannot sit or stand for more than 20 minutes without becoming very uncomfortable, experiencing pain from her neck to her tail bone and pain and numbness in her feet. (R. 83–4). She also stated that she has difficulty bending at the waist, twisting her upper torso, gripping and typing which causes pain in her hands. (R. 84–91).

### B. Plaintiff's Employment History

Plaintiff was born on March 10, 1948. She was 44 years old at the time she sustained her back injury. She has a high school GED and has taken almost two years of college courses in an advanced nurse's aide program. She is certified as a nurse's aide. Her relevant past work experience includes sedentary work as a document analyst, and sedentary work as a telemarketer.

Plaintiff had injured her back in 1992 during the course of her employment as a nurse's aide [2] at a group home for developmentally disabled adults, when she was attempting to lift a patient into bed. Plaintiff attempted to return to this job on several occasions, but continued to experience problems with her back. She last worked in this capacity in May, 1992. Plaintiff was given a 5% permanent partial disability rating and received worker's compensation benefits for a period of time in 1992 and 1993, with a lump-sum award of $7200 in 1994.

Other than her attempts to return to her job at the group home, plaintiff's only employment following her back injury was from January to March 1995, when she worked as a document analyst, analyzing documents by computer. The job required basic computer skills, which she had learned at home, and a lot of typing. The job was a sedentary job (R. 104), involving almost all sitting, although plaintiff testified that she had to get up frequently to walk around. In March, she was laid off and did not work again through the date of the ALJ's decision. (R. 62–63).

### C. Plaintiff's Medical History

As this Court is required to do in assessing whether there is substantial evidence in the record to support the ALJ's decision, we have reviewed plaintiff's extensive medical records in detail. Only the most pertinent are discussed below.

Beginning in 1992, plaintiff was treated by numerous doctors (over 12) for her

---

**2.** Plaintiff's job title was program instructor. She had worked in this capacity for approximately three years. Her job entailed working with developmentally disabled adults, passing out medications, taking the patients on outings, cleaning the group home, teaching the patients to care for themselves. Her job involved significant lifting. (R. 57). This job was described by the VE as having medium, or possibly higher, physical exertional requirements. (R. 103–04).

continuing complaints of spinal and back pain, numbness in arms, hands, legs, and feet, and chest pain. Plaintiff was initially treated by Dr. Golden, her family doctor, for low back pain and muscle spasms. No surgery was recommended, and her treatment consisted primarily of muscle relaxants, as well as physical therapy and chiropractic manipulation, although plaintiff had difficulty with the physical therapy due to her complaints of chest pain on exertion. (R. 237– 65). A physical therapy progress note dated April 23, 1992, indicated that the plaintiff was making excellent gains with physical therapy and had only minimal pain in her back, and normal postural symmetry and range of motion. Plaintiff appeared ready for return to work. (R. 194). The following month, however, plaintiff experienced intense abdominal and chest pain with exercise and discontinued her physical therapy until further cardiac and abdominal testing. (R. 193).

In May, 1992, she began seeing Dr. Derby, an orthopedic surgeon. He found no evidence of disc injury or nerve root irritation and hoped to get her back to work in four to six weeks.

Plaintiff was hospitalized in June, 1992, for evaluation of her chest pains. She refused to have a cardiac catheterization performed and she was discharged on medication with a nonspecific diagnosis of chest pain and secondary diagnoses of hypertension and hiatal hernia with esophagitis and gastritis. (R. 197–98).

A CAT Scan of the lumbar spine in June, 1992, showed a lumbar disc herniation at L5–S1, impinging on the nerve root. (R. 245).

In 1993, plaintiff was treated by Dr. Cooper, a neurosurgeon, who opined that her continuing back, buttock and thigh pain was musculoligamentous in origin. He found nothing on examination to suggest radiculopathy consistent with a clinically significant disc herniation. He did not think that she could return to her previous job as a nurse's aide, but he did feel that she could return to lighter work. (R. 201–02).

Plaintiff was also treated by Dr. Cabin, a cardiologist, for her complaints of chest pain in 1992 and 1993. He noted that she was experiencing chest pain two to three times per week and that it sometimes was relieved with nitroglycerin. He prescribed various medications for her high blood pressure. (R. 206–10). In April 1993, plaintiff had a cardiac catheterization performed which showed a "completely normal coronary system." (R. 218).

In 1992 and 1993, plaintiff was treated by Dr. Colsen, a podiatrist, for complaints of pain, swelling, and numbness in her feet. (R. 223–26).

Dr. Shafer, an orthopedist, performed an independent medical examination ("IME") of plaintiff in June, 1993. He was of the opinion that she had strained her back and that there may be some nerve root irritation at L5–S1. He did not think that she needed surgery. He gave her a 5% permanent partial disability rating and stated that she was not totally disabled. She could work with a 15 to 20 pound lifting restriction but could not do repetitive lifting. He concluded, "I feel that she needs no further treatment and she should just find work that is less strenuous." (R. 226–27).

A second IME performed by Dr. Salame, a neurosurgeon, in August, 1993, produced similar findings. He felt that her back problems were most likely musculoskeletal in origin. He recommended a medially supervised weight loss program, physical therapy and an EMG of the right lower extremity because of her symptoms of right radiculopathy, which were not substantiated by any objective neurological findings. He gave plaintiff a 5% disability rating to the whole body, which corresponded to a 4.5% impairment of the lumbar spine. (R. 229–30).

An EMG, performed by Dr. Alessi, a neurosurgeon, on November 5, 1993, showed no evidence of nerve injury at S1

or of ongoing denervation. Plaintiff exhibited decreased pinprick sensation on the right foot and leg. Dr. Alessi was of the opinion that plaintiff had suffered some injury to the L5 nerve root in the past but there was no evidence of ongoing injury. (R. 231–32).

In 1994, plaintiff began treating with Dr. Sumner for back and leg pain and numbness in her right foot. Dr. Sumner diagnosed mechanical back pain with an abnormal disc at L5–S1. He recommended exercises and a walking program and stated that she was capable of a moderate level of work with a lifting limit of 20 to 25 pounds. The work should not require frequent bending and stooping, no overhead reaching, and she would need to change position. (R. 337).

In early 1995, Dr. Halperin, an orthopedic surgeon, treated plaintiff for her back problems, including neck pain radiating into her shoulders, spine, right buttock and thigh. He diagnosed chronic cervical, thoracic and lumbar pain syndrome due to sprain/strain, but found no neurological deficits. He did not find anything structurally wrong with her. He advised the plaintiff to get back to a more normal lifestyle and to increase her physical activity with regular exercise. He reported that plaintiff had advised him that she had a 25 pound lifting restriction and he suggested that she disregard this recommendation. He was of the opinion that if she lifted properly she could lift without restriction. He indicated that plaintiff planned on going back to work in the near future. (R. 291–92).

Due to plaintiff's complaints of increasing pain, Dr. Halperin ordered an MRI, which was performed on February 5, 1995, and was essentially normal with multi-level disc bulging at L3–L4, L4–L5, and L5–S1 and no spinal stenosis or herniated discs. (R. 293–95). Dr. Halperin found the plaintiff to be neurologically intact.

In April, 1995, plaintiff went to the emergency room, after a day of fishing and walking, with complaints of low back pain and radicular pain radiating into her right thigh and foot. Aside from minimal tenderness about the sacrum, her back examination was normal. She exhibited full range of motion in her back with minimal guarding. She had normal circulation in her lower extremities and strength bilaterally. Plaintiff was advised to maintain as much mobility as possible and to follow up with Dr. Sumner. When she saw Dr. Sumner two weeks later, the flare-up of her back pain had subsided, although she was still complaining of low back pain. She exhibited nearly full range of motion and had no neurological deficit. Dr. Sumner stated that she was capable of sedentary work. In October, 1995, Dr. Sumner saw plaintiff again for her complaints of back, neck, shoulder and buttock pain. He again found no neurological deficits and reasonable strength. He stated that because she had been out of work for several years and due to her poor performance over the past few years, he felt it highly unlikely that she would return to work and was "functionally probably not achievable." (R. 331). In November, 1995, he stated that she was totally disabled. In a letter dated April 19, 1996, he stated that he had discharged the plaintiff. He found her very resistant to the idea of returning to work, very resistant to any sort of physical therapy and very resistant to any sort of endurance training. He had very little to offer her. (R. 357). Despite Dr. Sumner's discharging plaintiff, she did go back to see him in June, 1996, with complaints of tingling in both hands and achiness in both arms. He found mild impingement in both shoulders but a full range of motion. He continued plaintiff on anti-inflammatories. (R. 362).

Plaintiff also treated with Dr. Johnson, her family doctor, in 1995 and 1996 for her neck pain and stiffness and numbness in the right hand and arm and right chest. (R. 369–370). He prescribed medication for what he described as degenerative disc disease of her neck and "a syndrome which has now evolved into a chronic pain syn-

drome." He encouraged her to exercise and did not place any restrictions on her activities. He indicated that he did not perform an in depth analysis of her chronic condition because of the multiple physicians she had already seen for this. He stated that he did not feel that she could perform any physical work at all but did not feel qualified to give an opinion concerning her ability to perform non-exertional labor.

## DISCUSSION

### A. Standard of Review

Judicial review of an ALJ's ruling denying social security benefits is limited. *Yancey v. Apfel,* 145 F.3d 106, 111 (2d Cir.1998). It is not the Court's function to determine de novo whether the plaintiff is disabled. *Schaal v. Apfel,* 134 F.3d 496, 501 (2d Cir.1998). Rather, a district court must review the ALJ's decision to determine whether the factual findings are supported by "substantial evidence" or whether the decision is based on legal error. 42 U.S.C. § 405(g); *Bubnis v. Apfel,* 150 F.3d 177, 181 (2d Cir.1998). Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). Thus, the role of this Court is not to decide the facts anew, nor to reweigh the facts, nor to substitute its judgment for the judgment of the ALJ. Rather, the decision of the ALJ must be affirmed if it is based upon substantial evidence even if the evidence would also support a decision for the plaintiff. *Dobson v. Chater,* 927 F.Supp. 1265, 1270 (D.Neb.1996).

### B. Plaintiff's Arguments

In support of her appeal, plaintiff relies primarily on the letter brief of her attorney submitted to the Appeals Council (R. 397–401). Plaintiff has also filed with this Court a letter brief in which she raises several additional arguments not presented to the Appeals Council, including the submission of certain additional medical records which she claims were "missing;" a statement of the VE at the hearing that is allegedly missing from the transcript; and the fact that the ALJ found that she met disability insured status. (Ltr. from Pl. to Court, dated 12/2/99, Doc. # 13). The Supreme Court has recently held that issue exhaustion before the Appeals Council of the Social Security Administration is not required in order for a plaintiff to raise an issue on appeal to the District Court. *See Sims v. Apfel,* 530 U.S. ——, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000). Accordingly, we are required to consider not only the arguments raised by plaintiff's former counsel in his brief to the Appeals Council but also those raised for the first time on appeal by plaintiff in her letter brief to this Court.

### 1. Additional Medical Records

█ Some of the allegedly "missing" records that plaintiff has submitted are part of the record and some are not. Under § 405(g), we may remand a case to the Secretary for consideration of new evidence, but a remand is appropriate only upon a showing that the evidence is new and material to the claimant's condition during the relevant time period encompassed by the disability application under review, and there is good cause for not introducing the evidence during the administrative proceedings. *Lisa v. Secretary of HHS,* 940 F.2d 40, 43 (2d Cir.1991); *Anderson v. Bowen,* 868 F.2d 921, 927 (7th Cir.1989); *Milano v. Apfel,* 98 F.Supp.2d 209, 214 (D.Conn.2000). We have examined plaintiff's proposed new evidence, and we find that it does not meet that standard.

With respect to the records that *predate* the ALJ's decision, most of these are already part of the record. As to the ones that are not part of the record, there has been no showing of good cause as to why they were not presented to the ALJ. Moreover, these reports appear to be cumulative of evidence already in the record

or pertaining to medical conditions unrelated to plaintiff's claimed disability.[3]

■ As for the records relating to medical care that plaintiff received *after* the ALJ's hearing, these reports speak primarily to plaintiff's current condition, not to her condition at the time her application was under consideration by the Social Security Administration. If plaintiff has developed additional impairments since her first application for benefits, she may file a new application. *Kapusta v. Sullivan*, 900 F.2d 94, 97 (7th Cir.1989).

The new records include (1) a letter from plaintiff's gynecologist regarding postmenopausal symptoms and a mild rectocele and cystocele, which the plaintiff was declining to address at that time, January 29, 1999; (2) an echocardiography laboratory report and cardiopulmonary laboratory report from October, 1999; (3) records dated August, 1998 from Dr. Ouellette concerning plaintiff's irritable bowel syndrome and a colonoscopy that showed large internal hemorrhoids; and (4) a letter dated November 5, 1998 from Dr. DiFrancesca regarding his treatment of plaintiff in November 1995 for foot pain, for which he recommended orthotics. Other than the letter from Dr. DiFrancesca and the laboratory reports, which we find are not material, these records pertain to conditions other than those on which plaintiff bases her disability claim. Therefore, we do not believe that a remand is necessary for consideration of these additional records.

### 2. Transcription Error in VE's Testimony

Plaintiff also claims that part of the tape recording from the ALJ's hearing was erased, specifically a statement by the VE that because Social Security does not consider part-time work to be substantial gainful employment, plaintiff would be considered disabled. We have no verification by sworn affidavit or otherwise that this statement was made by the VE and not included in the transcript. Based on plaintiff's unsworn allegation, we cannot read this statement into the transcript.

■ More importantly, however, we do not read the Regulations as automatically eliminating part-time work from the definition of "substantial work activity." The Regulations define that term to include "work activity that involves doing significant physical or mental activities." A claimant's work may be substantial "even if it is done on a part-time basis." 20 C.F.R. § 404.1572(a); *see Davis v. Secretary of HHS*, 915 F.2d 186, 189 (6th Cir. 1990); *Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir.1990); *Gadsden v. Chater*, No. 96–3103, 1997 WL 34659 (E.D.Pa. Jan. 29, 1997); *see also Rinker v. Chater*, No. 95 Civ. 3923(CSH), 1997 WL 47791, at *7 (S.D.N.Y. Feb. 6, 1997) (finding that the need to work part-time is a factor affecting an individual's employability and that the grids may not be used when an individual is limited to part-time work). Therefore, we decline to remand or reverse the ALJ's decision based upon this alleged transcription error.

### 3. Disability Insured Status Requirements

■ Plaintiff also points to the ALJ's statement that she met the disability in-

---

**3.** Plaintiff has attached the Operative Record from Lawrence and Memorial Hospital dated 7/30/96 and Radiology Reports from 1996. The information concerning her fibroids and her surgery is already contained in the record. *See* R. 393–96. There is also a letter from Dr. Derby dated February 3, 1993, to Liberty Mutual, regarding plaintiff's disability due to chest pain of undetermined etiology. This is already part of the record. *See* R. 244.

Plaintiff has also attached a November 21, 1995 "Addendum to Chart" by Dr. Sumner. This document is part of the record. *See* R. 330. Likewise, the Lawrence and Memorial Hospital summary for 6/15/92 to 6/17/92 is also part of the record, *see* R. 197–98, as is the radiology report dated 2/5/95, *see* R. 295, and the records from Dr. Golden, *see* R. 297–308.

sured status requirements of the Social Security Act on March 14, 1992, and continued to meet them through the date of his decision. This statement, however, did not mean that plaintiff was "disabled" as of March 14, 1992. Rather, the ALJ was simply stating that she met the "insured status" requirements of the Act, *see* 42 U.S.C. § 423(c), to be eligible for DIB. An applicant for DIB benefits must meet several requirements in addition to being under a disability. He or she must be insured, as defined in subsection (c)(1) for disability insurance benefits, 42 U.S.C. § 423(a)(1)(A); he or she must not have attained retirement age, 42 U.S.C. § 423(a)(1)(B); he or she must file an application for DIB, 42 U.S.C. § 423(a)(1)(C); and he or she must be under a disability, 42 U.S.C. § 423(a)(1)(D). *See also* 20 C.F.R. §§ 404.101(a), 404.110–404.130, 404.130–404.133; *Arnone v. Bowen,* 882 F.2d 34, 37 (2d Cir.1989). In order to be insured, the applicant must have (1) adequate social security earnings to be "fully insured," 20 C.F.R. §§ 404.110–404.115; and (2) "disability insured status" in the quarter he or she became disabled or in a later quarter in which he or she was disabled, 20 C.F.R. § 404.131(a). In this case, the ALJ determined that plaintiff met these requirements and then turned to the more difficult issue of whether she was disabled. Thus, his statement that she met disability insured status requirements was not a finding of disability.

### 4. Arguments to the Appeals Council

As noted, plaintiff also relies on the arguments made by her former attorney to the Appeals Council, which focus primarily on the ALJ's allegedly erroneous determination concerning plaintiff's RFC to perform her past relevant work, as well as his alternative finding that there was suitable alternative employment in the national economy. Plaintiff's attorney asserted that the Commissioner did not meet his burden of showing that the plaintiff could perform work at the sedentary level of exertion or that there were a significant number of "sedentary sit/stand option" jobs that plaintiff would be able to perform. More specifically, he argued that the ALJ's finding that the "claimant has the residual functional capacity to perform work-related activities except for work above the light exertional level ... as long as she can alternate between sitting and standing at will" was internally inconsistent, because this description of plaintiff's RFC did not meet the requirements for light or even sedentary work. He also argued that the VE's testimony that plaintiff could perform the sedentary jobs of bench assembler and surveillance monitor was in error because these jobs require light to medium levels of exertion according to the United States Department of Labor's *Dictionary of Occupational Titles* ("DOT") listings, and there was no basis for the assertion that a significant number of surveillance monitor positions exist in Connecticut. He also argued that there was no basis for finding that plaintiff could perform her past work as a telemarketer, which is a sedentary position, because that position would not allow plaintiff to alternate between standing and sitting, citing *Rosario v. Sullivan,* 875 F.Supp. 142, 148 (E.D.N.Y.1995) (holding that the concept of sedentary work normally does not contemplate situations where the claimant must alternate between sitting and standing). Finally, he challenged the ALJ's finding that the claimant's allegations as to the severity of her pain and the degree of her disabling impairment were not credible.

The ALJ in this case analyzed plaintiff's disability based upon the five-step sequential evaluation process dictated by the Regulations. *See* 20 C.F.R. § 404.1520. The first step is to determine if the claimant is involved in substantial gainful activity. 20 C.F.R. § 404.1520(b). The plaintiff was not. The second step is to determine whether the claimant has a severe impairment that significantly limits her physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The ALJ

found that plaintiff had a severe physical impairment. The third step is to determine whether the claimant's impairment(s) meet or equal an impairment in the "listings." 20 C.F.R. §§ 404.1520(d), 404.1525. None of these findings are disputed by the plaintiff. At the fourth step, the plaintiff has the burden of proving that she lacks the RFC to perform her past relevant work. 20 C.F.R. § 404.1520(e). Here the ALJ found that plaintiff could perform her past work as a telemarketer, a finding that plaintiff disputes. In the alternative, the ALJ went on the fifth step of the evaluation process, at which step the ALJ considered whether there was alternative, substantial gainful work in the national economy that the plaintiff could perform given her RFC, age, education, and past work experience. 20 C.F.R. § 404.1520(f); *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir.1986). The Commissioner bears the burden of proof as to this fifth step. *Koseck v. Secretary of HHS*, 865 F.Supp. 1000, 1010 (W.D.N.Y.1994). In this regard, the ALJ relied on the opinion of the VE that plaintiff could perform a significant number of jobs in the national and local economy at the light and sedentary levels of physical exertion with a sit/stand option.

4. He also found that she could lift and carry up to 10 pounds occasionally; and that she could bend, climb steps and reach only occasionally. He further found that she could not use her hands for grasping, pushing or pulling, and could not use her right hand for fine manipulation. (R. 358).

5. He also stated that she could lift and carry up to 10 pounds frequently and 20 pounds occasionally; that she could never bend, but could climb steps and reach occasionally; and that she could perform grasping, pushing and pulling with both hands, as well as fine manipulation. (R. 390).

6. "Sedentary work" is defined by the regulations as involving lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain

### a. Plaintiff's RFC to Perform Sedentary or Light Work

██ The record in this case clearly contains conflicting reports concerning plaintiff's RFC. Plaintiff's position is supported by the report of Dr. Johnson, plaintiff's family doctor, who indicated that plaintiff could only sit for 4 hours and stand/walk for 1 hour in an eight-hour day.[4] That in and of itself would limit her to part-time work. In 1996, Dr. Sumner also completed an RFC Form, indicating her ability to sit 4 hours in an 8 hour day and to stand/walk up to 2 hours.[5] Based on these RFC Forms, plaintiff argues that these limitations do not allow her to perform full-time sedentary work.[6] As noted above, we do not read the Regulations as limiting substantial gainful employment to full-time work.

Moreover, there are other reports that support a finding that plaintiff had the RFC to perform at a sedentary level of physical exertion. In 1992, at one point, plaintiff was ready to return to work and Dr. Cooper felt that she could do light work. In 1993, Dr. Shafer found that she could lift 15 to 20 pounds, although not repetitive lifting. In 1994, Dr. Sumner found her capable of a moderate level of work with lifting limits of 20–25 pounds. In 1995, he found her able to do at least

amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a).

"Light work" involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time. 20 C.F.R. § 404.1567(b).

sedentary work, and Dr. Halperin found that she could return to work without any restrictions, and in fact, plaintiff did return to work as a data analyst for three months, until she was laid off. The RFC Assessment completed by medical consultant Dr. Monticciolo in August, 1995, indicated that plaintiff could lift up to 20 pounds occasionally and 10 pounds frequently; that she could stand and/or walk about 6 hours in an eight-hour workday; and that she could sit the same length of time. Her ability to push and pull was unlimited. All postural limitations (climbing, stooping, kneeling, etc.) were only occasionally limited. (R. 125–132). On plaintiff's request for reconsideration of the State agency's denial of disability benefits, a second RFC assessment was performed in October, 1995, with similar findings. (R. 142–48). Thus, there was substantial evidence from both plaintiff's treating physicians as well as from the Social Security examining physicians that would support plaintiff's RFC to perform at least sedentary work.

In *Bapp v. Bowen*, 802 F.2d at 606, the Second Circuit held that if non-exertional limitations significantly diminish a claimant's ability to perform the full range of light work, testimony of a vocational expert or other similar evidence with regard to existence of jobs in national economy was required. Thus, in this case, the ALJ solicited testimony from the VE in this regard. The VE testified that, although a sit/stand requirement would eliminate some sedentary jobs, not all sedentary jobs require the employee sit for six hours straight without the ability to stand frequently or as needed. Common sense dictates that within the five categories of physical exertion requirements there would be a range of sit/stand options available. In response to the ALJ's hypothetical, the VE testified that, assuming a person of plaintiff's age and educational background, who could lift and carry up to 25 pounds occasionally, but without frequent bending or stooping, and who required a position that would allow her to change positions at times, but no overhead

reaching and no prolonged walking or standing, plaintiff could perform her past relevant work as a document preparation specialist and telemarketer. (R. 109). If the plaintiff could only sit 15 to 20 minutes at a time, and stand only 10 minutes, so that she would have to get up every 15 or 20 minutes, plaintiff could not work as a document preparation specialist because of the productivity requirements, but the VE was of the opinion that there would be telemarketer positions that would allow this degree of flexibility. (R. 110). He was also of the opinion that there were certain assembly jobs that would allow the worker this kind of flexibility, and estimated 1,000 to 1,500 such jobs in Connecticut, and well over 100,000 nationally (R. 111); as well as certain surveillance monitoring jobs, of which there were 150 to 200 locally and 30,000 to 50,000 nationally; and cage cashier positions of which there were 600 to 700 locally and 100,000 nationally. (R. 112). These involved jobs requiring up to a light level of physical exertion.

If the weight restriction were limited to no more than 10 pounds on an occasional basis, the VE testified that it would reduce the number of assembly and cage cashier jobs locally and nationally, but not surveillance monitor jobs. (R. 113).

The ALJ then posed a hypothetical question to the VE based upon Dr. Johnson's RFC Form, which limited plaintiff to part-time employment by stating that she could only sit 4 hours and stand 1 hour out of an 8–hour day, and that she could lift/carry no more than 10 pounds occasionally, and occasionally climb, reach and bend, but that she had problems with grasping, pushing, pulling and fine manipulation. The VE responded that this would represent a part-time worker, which would impact her ability to do assembly work. The limitations on her ability to do fine manipulation would impact her ability to work as a cashier. However, he thought that there would be surveillance

monitoring jobs that she could perform. (R. 115).

Thus, even accepting the limitations set forth in Dr. Johnson and Dr. Sumner's RFC Forms, there was substantial evidence in the record to support the ALJ's conclusion that there were a significant number of jobs in the national and local economy that plaintiff could perform, given her RFC, age, education, and past work experience.

### b. Conflict with the Dictionary of Occupational Titles

■ Plaintiff next asserts that ALJ improperly relied on the VE's testimony that plaintiff could perform the sedentary jobs of bench assembler and surveillance monitor, because these jobs are classified in the DOT as requiring a light to medium levels of physical exertion and there was no basis for concluding that significant numbers of these jobs exist in the national or local economy.

In his testimony, the VE did not rely specifically on the job categories set forth in the DOT and was not required to do so. The Regulations simply provide that this is one of several sources that the ALJ may take administrative notice of in determining whether unskilled, sedentary, light, and medium jobs exist in the national economy and in significant numbers in the region where the claimant lives or in several regions of the country. 20 C.F.R. § 404.1566(d). The Regulations also allow for the use of a VE, 20 C.F.R. § 404.1566(e), but do not require the VE to base his or her testimony on the DOT listings. In *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir.2000), the Court held that even if a vocational expert's testimony is contradicted by the DOT descriptions, a hearing officer is entitled to rely on expert testimony that contradicts such authorities.

The VE testified to assembly packaging jobs, as well as surveillance monitoring positions, and cage cashiers. He limited his testimony concerning the number of jobs available to those that met the weight-lifting restrictions imposed by the ALJ's hypothetical. He did not testify that plaintiff could perform all assembly jobs. Rather, his estimates were restricted to the weight lifting restrictions set forth in the hypothetical. When the ALJ amended his hypothetical to encompass only those jobs meeting the sedentary weight restrictions, the number of available jobs decreased substantially.

In *Jones v. Chater*, 72 F.3d 81, 82 (8th Cir.1995), the court held that where the VE specifically limited his opinion to reflect sedentary work only (requiring lifting of up to 10 pounds occasionally), his testimony was a "perfectly acceptable basis for the administrative law judge's conclusions," despite the fact that the DOT characterized these same jobs at higher levels of physical exertion. The ALJ was not required to pose his hypothetical questions to the VE in terms of the DOT job definitions, which are only general descriptions and do not encompass every job in that category. Moreover, he was entitled to assume that the VE responded specifically to the limitations included in the ALJ's hypothetical.

Plaintiff's counsel offered no evidence to contradict the VE's expert opinion regarding the number of available jobs. In this case, the expert was asked specifically for the number of jobs available given plaintiff's physical limitations. To argue that the jobs to which he testified did not meet plaintiff's physical limitations ignores the express limitations clearly set forth in the ALJ's hypothetical questions. *See Powers*, 207 F.3d at 436–37. We find no error in the ALJ's relying on this expert testimony in support of his determination at step 5 that there were a significant number of jobs in the national and local economy that plaintiff could perform given her RFC, age, education, and past work experience.

■ Additionally, as discussed above, this was only an alternative basis for finding plaintiff not disabled. To the extent that we find substantial evidence to sup-

port the ALJ's finding at the previous step in the sequential evaluation process that plaintiff could perform her past relevant work as a telemarketer, any error at Step Five would constitute harmless error.

### c. Her Past Telemarketer Job

■ Plaintiff next argues that the ALJ erred in finding that she could perform her past relevant work as a telemarketer because his decision was based upon a mere assumption that plaintiff could find a telemarketing job that would allow her to alternate between sitting and standing at will. Plaintiff states that this is a sedentary job and that almost all the functions of the job would be difficult to perform in a standing position. (R. 399). Plaintiff again relies on the DOT definition, which lists the job as sedentary, and cites to the Regulation's definition of "sedentary," 20 C.F.R. § 404.1567(a), which provides that sedentary work involves sitting, although a certain amount of walking and standing is necessary in carrying out job duties.

The ALJ relied on the VE's testimony that, as performed in the national economy, there was a wide variation in the amount of sitting required for the position of telemarketing. The VE testified that the job of telemarketer is "all over the ballpark. I mean, you could find companies which say, sure, you can stand if you want to talk on the phone standing ... but, here, we'll give you a podium and you can write on the podium here, or you can sit, whatever you want to do." (R. 110).

Although the definition of a sedentary job indicates that it involves sitting with a certain amount of walking and standing, the definition does not preclude all jobs where the employee has to change positions frequently, as plaintiff would require. In those cases where a claimant must alternate between standing and sitting, the courts have generally required the ALJ's to consult vocational resources before making a disability determination. *See, e.g., Brunel v. Apfel,* No. CIV. 97–306–M, 2000 WL 36962, at *3 (D.N.H. Dec. 3, 1999); SSR 83–13, at *3 (stating that, because most jobs have ongoing work processes which demand that a worker be in a certain place or posture for at least a certain length of time to accomplish a certain task, in a case of unusual limitation of ability to stand or sit, a vocational resource should be consulted to clarify implications for the occupational base). The ALJ in this case did just that. He took sworn testimony from the VE and then found that plaintiff's past relevant work as a telemarketer did not require the performance of work-related activities precluded by her physical limitations. This finding was not based on mere assumption but was based upon the uncontradicted testimony of the VE. We find no error in this regard.

### d. The ALJ's Credibility Assessment

■ Lastly, plaintiff challenges the ALJ's finding that the severity of pain and degree of incapacity alleged by plaintiff were not supported by the evidence as a whole and that her testimony was not credible to the degree alleged or to a degree that would preclude the residual functional capacity found therein. (R. 33). She asserts that medically accepted clinical and laboratory diagnostic techniques supported her allegations. (R. 401).

First, it should be noted that the ALJ did not discredit plaintiff's complaints in their entirety. He found that her chronic back pain significantly affected her ability to engage in basic work activities and constituted a severe impairment. (R. 22). He gave credence to her complaints of pain if she sits or stands for too long. (R. 31). He further found that the medical evidence established that plaintiff has severe pain. (R. 32). He did, however, find that she had exaggerated her limitations and the intensity and persistence of her pain. (R. 30). He noted that she had engaged in substantial, gainful employment in 1995. Her symptoms changed from one doctor to the next and she constantly changed doctors. Furthermore, all Functional Capacity Assessments found

her capable of performing at least at the light level of exertion. We find no error in this regard.

The ALJ was in the best position to see, hear, and judge plaintiff's forthrightness, based not only upon what she had to say at the hearing, but also based upon his personal observations of her. His credibility determination should be reversed only if it was patently wrong.

In making his determination, the ALJ was required to consider the subjective complaints of pain by plaintiff. *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir.1979). However, it was within the discretion of the ALJ to give the subjective complaints of pain less weight relative to objective medical evidence. *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir.1983). In fact, the ALJ would have erred had he relied exclusively on plaintiff's complaints of pain. *See* 42 U.S.C. § 423(d)(5)(A) ("An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability"). Other factors that should be considered include the plaintiff's medical history, diagnoses, daily activities, prescribed treatments, efforts to work and any functional limitations or restrictions caused by the pain. 20 C.F.R. § 404.1529; *Gonzalez v. Apfel*, 23 F.Supp.2d 179, 191–92 (D.Conn.1998).

Disability requires more than a mere inability to work without pain. *Dumas v. Schweiker*, 712 F.2d 1545, 1552 (2d Cir.1983). The ALJ did not discredit plaintiff's complaints of pain entirely. He found instead that the medical evidence did not corroborate her allegations of disabling pain. Based upon our careful examination of the entire record, including the medical evidence, the functional assessments and the consultative examinations, as well as plaintiff's work history and history of medical treatment, we find substantial evidence to support the ALJ's credibility determination as to plaintiff's subjective complaints of pain. *See Dunn v. Chater*, 101 F.3d 1392, 1996 WL 387218, *3 (2d Cir.1996) (unpublished decision).

## CONCLUSION

Accordingly, the Defendant's Motion to Affirm the Decision of the Commissioner is GRANTED [Doc. # 11]. Plaintiff's Motion to Reverse or Remand is DENIED [Doc. # 9].

SO ORDERED.